UNITED STATES of America,
Plaintiff-Appellee,

v.

Earl JONES, Robert Glen Hyams, Connie Janko, Tommy Duane Ramsey, Deborah Sue Ramsey and Conrad Janko, Defendants-Appellants.

Nos. 76–2153, 76–2194 to 76–2198.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 8, 1978.

Decided June 12, 1978.

WILLIAM E. DOYLE, Circuit Judge.

## I.

The appellants who now appear before us, with the exception of Robert Hyams, were present in *United States v. Heath, et al.*, Nos. 76–2158–65. Earl Jones, Tommy and Deborah Ramsey and Connie and Conrad Janko were previously tried in *Heath*. The jury in *Heath* was unable to agree as to their guilt, and as a consequence a mistrial was granted as to each of them. But in the present case all were convicted, as was Robert Hyams, of conspiracy to distribute heroin, contrary to 21 U.S.C. § 846. In addition, Earl Jones was convicted of violating 21 U.S.C. § 952, importation of heroin.

In this court Jones has filed a separate brief. The remaining defendants have joined in a single brief, which advances the identical points. Their main contention is antagonistic to Jones. Their claim is that the trial court ought to have granted their motion for a severance pursuant to Rule 14 of the Rules of Criminal Procedure following receipt by it of evidence relating to Jones, but inadmissible to them and which they contend is prejudicial to them. Their contention, and a similar one by Earl Jones insofar as it complains of prosecutorial misconduct of Assistant U. S. Attorney Miller, is similar. However, the adversary group of appellants also complain that evidence offered by Jones to impeach a witness and other evidence brought out against Jones and his attorney was prejudicial to them. Also urged by the group of appellants is alleged error of the trial court in rejecting evidence offered by Jones for the purpose of impeaching prosecution witnesses.

Earl Jones argues:

1. The prosecutorial misconduct of Duane Miller.

2. That he was entitled to be tried separately from the other defendants.

3. That the court erred in restricting Jones' counsel in his efforts to impeach witnesses Hulsey and Hines.

John E. Green, First Asst. U. S. Atty., Oklahoma City, Okl. (Larry D. Patton, U. S. Atty., Oklahoma City, Okl., on the brief), for plaintiff-appellee.

Jo-Ann Askins, Oklahoma City, Okl., for defendant-appellant Jones.

Thomas D. McCormick, Oklahoma City, Okl., for defendants-appellants Hyams, Jankos and Ramseys.

Before SETH, Chief Judge, and LEWIS and DOYLE, Circuit Judges.

4. That there was insufficient evidence in support of his conviction on the charge of importation of heroin.

As mentioned, this case is a sequel to *United States v. Heath, et al.* Inasmuch as we detailed the evidence in our opinion in *Heath*, it is only necessary to describe those parts of the evidence which relate to the legal problems advanced by appellants.

## II.

*Mary Jo Hulsey* was the principal witness for the prosecution in the present case. She had been deeply involved in the importation of the heroin. The supply thus obtained resulted in widespread wholesale and retail sales. She described the importation by her. She would obtain a large sum of money, several thousands from Jones or Heath, and would walk across the border with the heroin secreted inside her person. Jones introduced her to Roger Sanders, who instructed her concerning secreting the heroin and crossing the border. After being instructed, she made this trip on numerous occasions under the direction of Roger Sanders. In each instance she purchased about four ounces of heroin and used Jones' money or that of Heath to buy the heroin. After she had obtained it and it had been cut, she would deliver it to Heath or Jones. She named a number of people who had purchased heroin from Jones. The purchasers are described as follows:

*Peggy Hines* testified that she had purchased heroin from Jones several times.

*Barry Bolding* testified that he had sold heroin for Vernon Heath, and that after his arrest in January 1976, he had cooperated with the police in an effort to arrange a buy from Heath, but could not reach him. He was told by the appellant Robert Hyams that Heath was out of town and that he, Hyams, was handling the heroin for Heath. Bolding thereupon agreed to purchase three ounces from Hyams for $3,300. He was unable to make contact with Hyams, but succeeded in contacting Hyams' wife, who said that she could provide the heroin. She was asked to bring it to Bolding's apartment and when she did she was arrested. A search of her car disclosed the heroin in her car.

According to Bolding, Heath was living at Hyams' house and when he went there Heath would have Hyams pick up the heroin for him.

An undercover police officer, Gillum, testified that he had purchased heroin from Connie Janko once and had made arrangements to buy more the next day. She said that she would get it from Tommy and Debbie. The next day he met Connie and Conrad Janko and gave Conrad $200 for heroin. They agreed to make the delivery at a supermarket lot. The Jankos were followed to the home of Tommy and Debbie Ramsey, where they stayed for a few minutes and then proceeded to the grocery store. Conrad Janko was arrested there and attempted to throw down a plastic bag containing heroin. A warrant was obtained, a search was made of the Ramsey house and this revealed heroin in a shed in the back yard.

The evidence of *Eddie Lawson* was that the Ramseys were in the heroin business and that he had purchased from them frequently. He said that they obtained their heroin from Donald Babb, Heath's nephew, and that he had gone with Tom Ramsey to buy heroin from Emit Powell, who was shown to have been a major figure in the Heath organization.

The testimony which is most crucial to this appeal is that pertaining to the cross-examination of Mary Jo Hulsey involving as it did the introduction of a cassette tape that she made at the behest of Jones' attorney repudiating the testimony at the first trial. This is the background for the alleged prosecutorial misconduct.

All of this came to the surface as a result of Hulsey's unsuccessful effort to avoid testifying at the trial. In fact, she failed to appear at the trial on the appointed day.

When she finally appeared Jones' attorney cross-examined her asking her about having failed to appear for trial on the date which was originally set. She said that she had stayed in a motel in Tulsa that night and that she had seen Darryl Sneed, an individual who had acted as her bodyguard prior to her arrest for possession of heroin.

It was at this point in the cross-examination by Gregg that Duane Miller interrupted to call attention to the fact that Gregg had placed a cassette tape on the lectern. Miller asked that the tape be marked as an exhibit. Gregg said that the tape was his "work product" and would be introduced in evidence at the proper time. Gregg proceeded to ask Mary Jo Hulsey whether she had made a tape recorded statement in the presence of Sneed and another person. She said yes, but that the statement which she had made was untrue; that she had made it because she had been made to feel bad about things and thought that if she made the tape she would not be charged with a crime; that no one would be angry with her any more and that she "would have enough money to leave here on and transportation." Later she said that she had regretted the lie.

Gregg did not offer the tape at once and so Miller, the prosecutor, asked that the court seize it as "evidence of another crime." Miller then said that the tape evidenced tampering with the witness. Gregg responded that he did not think that Miller should be making accusations. The trial judge then said "I don't think you should either."

In response to questions of Miller asked on redirect, Hulsey explained the circumstances surrounding the making of the tape. Sneed had approached her about it and had indicated that no charges could be brought against her.[1]

Gregg called one Eugene Kralik, who testified that he was a friend of Gregg's and

---

1. The actual questions and answers shown by the transcript are as follows:

Q: Did he indicate to you that he had discussed that with the lawyer or had some information from a lawyer that those things were true, that if you lied, gave them a lying statement, that no charge could be brought against you?

A: Yes, sir.

Q: And he indicated that this came from a lawyer, that he had been advised by a lawyer that that was true?

A: Yes, sir.

Q: What else did he tell you?

A: That—that was about it, that if, that if I did this it would take, it would take care of a lot of things.

Q: Did he say what things it would take care of?

A: No, sir, he didn't. He didn't really say, but said there was no way I would, that charges could be filed on me, and that it would help some other people that I had hurt.

.    .    .    .    .

Q: Did he offer you anything else at that point?

A: I was going to get $5,000—

Q: Wait a minute. You were going to get $5,000 for giving this statement, is that what you are saying?

A: He didn't put it on me like—he just put it to me that I would have enough money to live on for awhile until I could find a job.

Q: Where did the $5,000 figure come in?

A: That's what he said. He said that I would have $5,000 to live on and transportation to help me go somewhere.

Q: And a car?

A: Yes, sir.

Q: He was going to give you $5,000, or somebody was going to give you $5,000. and a car if you would lie about your testimony, is that correct?

A: Yes, sir.  (Tr. 178–79)

Miller then asked her about the substance of the statement:

Q: Okay, let's talk about Carroll Gregg first. What did he ask you about Carroll Gregg, and that's Earl Jones' lawyer over here. What was asked, what question was asked about Carroll Gregg  .  .  .?

A: He asked me—I said that it was not true that I had ever delivered any kind of drug to his office and—

Q: To whose office?

A: To Mr. Gregg's office.

Q: All right.

A: And that he had never questioned me to, for any drugs of any sort. Never came to me and asked for me to deliver any to him. (Tr. 190)

At this point an objection was raised by one of the defense counsel that evidence about Mr. Gregg was not relevant. The court agreed that the objection was well taken and declared the overnight recess. A motion for mistrial was overruled.

The next morning, in chambers, Mr. Gregg insisted that he wanted to put the tape on as

that he, in the company of Sneed, had gone to a motel where they obtained the statement that was on the tape. Kralik testified that there was no mention of any bribes or inducements and that he had no reason to believe that the statement was not voluntary. He further said that it was Sneed who approached Gregg about selling information for $5,000 and that Gregg was very surprised. Kralik said that they agreed that they would pay if the information was useful and voluntary, but following the recording he had switched tapes on Sneed and had not paid him anything.

The court cautioned the jury once again that the matters having to do with this testimony pertained to Jones, the defendant, but not to any of the other defendants.

A similar tape, which also sought to repudiate past testimony, was made by Peggy Hines, who said that one Nancy James had told her that she should get in touch with Mr. Gregg, who would know a way to avoid testifying. She stated that she had spoken to appellant Jones on the telephone and that he had asked her to contact his attorney. She said that on either the 22nd or 28th of October, she had gone to Gregg's office and made a tape recanting her prior testimony that she had bought heroin from Jones. On the witness stand she said that this had been a lie; that she had made the statement in order to avoid testifying again. She also said that she had seen Earl Jones at Gregg's office on this occasion, for part of the time.

Gregg at first denied having this tape, but later said that he did have one which was made on October 12, in which she discussed pressures put on her by the government to testify. This was never received.

We have taken up the testimony concerning the tapes in some detail because they show the efforts to persuade Hulsey and Hines not to testify, together with the testimony that was given implicating Gregg in evidence of prior inconsistent statements by Hulsey. He felt that her testimony was sufficiently inconsistent that her present assertion that the tape was a lie was not sufficient to "taint" it. The court somewhat reluctantly said that he would be allowed to put the tape on but only on recross, as going only to her credibility, rather than during the course of his regular defense. The court instructed the jury that the evidence they had heard and would hear about what Mary Jo had done when she failed to show up for trial related only to Jones and that they must disregard it as far as any other defendant was concerned.

Mr. Miller then continued his redirect examination, again dwelling on the subject of Mr. Gregg:

Q: All right, will you tell us what that statement was that you made on the tape concerning Carroll Gregg?
A: Well, during the last trial it came out that I had delivered some cocaine to his office and I—
Q: Carroll Gregg's office?
A: Yes, sir.
Q: For Carroll Gregg?
A: Yes, sir.
Q: All right.
A: And that I was to deny doing this.
Q: What did you say on that tape that you were making on the 2nd of November in Tulsa about Carroll Gregg and that delivering cocaine to his office to him?
A: That I had never delivered it there.

Q: All right, was that a lie that you said on the tape?
A: Yes, sir. (Tr. 210)
The objections to this line of questioning were not renewed here.

Hulsey went on to recount that on the tape she had said that she had never had any heroin dealings with Jones or Heath. All this, she said, was false. She said that after the tape had been made, Sneed made a phone call and then told her to turn herself in to a woman named Nancy Risner at the KWTV station. Questioning her about her talk with Risner, Miller again brought up Gregg:

Q: Did she make any mention to you as to who your lawyer might be?
A: Yes, sir. She asked me if Carroll Gregg was my lawyer.

. . . . .

Q: What did you tell her?
A: No, he wasn't.

. . . . .

Q: Did she at any time mention to you the close personal, did Nancy Risner mention to you the close personal relationship that she has with Carroll Gregg and members of his law firm?
A: No, sir. (Tr. 214–15)
In conclusion, Hulsey testified that she had never actually received anything for making the tape and that she had changed her mind about it because she couldn't swear to a lie.

the purchase of a drug from Hulsey. Although generally collateral, we must consider whether it is prejudicial, first, to Jones, and, secondly, the other defendants.

### III.

### WHETHER JONES WAS PREJUDICED, WHEREBY HE WAS ENTITLED TO A REVERSAL AS A RESULT OF THE PROSECUTORIAL MISCONDUCT

The argument of Jones is that serious error arises from the fact that Duane Miller, the Assistant U. S. Attorney, accused Carroll Gregg, Jones' attorney, of committing a crime (tampering with a witness). Counsel says that Miller set out to destroy Jones' attorney and he thereby deprived him of counsel.

The difficulty with this is that it was Gregg who, while cross-examining Hulsey, produced the tape which had been made of the interview with Hulsey. This tape was made not long before Hulsey was called to testify. Gregg asked Hulsey about her failure to appear for trial as originally set the previous Monday, November 1, 1976. He brought out testimony that she had stayed in a motel in Tulsa. It was then that he placed the cassette tape on the lectern and asked to have it marked as an exhibit. It is true that Miller asked that the cassette be offered as evidence of another crime, and he then explained that it was evidence of tampering with a government witness.

▮ In the tape which, by the way, Gregg claimed as his "work product," Hulsey, it will be recalled, stated that her testimony previously given was false. She also said that testimony which she had given at the previous trial about delivering a drug to the office of Mr. Gregg was also false. At the trial she testified as to how all of this recording took place. Since Gregg insisted that the tape be put into evidence for the purpose of discrediting Hulsey as a witness, Jones has little standing to object. In determining admissibility of this tape, the trial court faced a dilemma. Gregg, Jones' lawyer, was insisting that it be put into evidence. If the court, in the face of this, had rejected it on the ground that it would open up collateral matters, Jones and his present counsel would be arguing that the trial court had deprived them of a right to impeach the testimony of the government's principal witness Hulsey. In the light of this, we do not consider the trial court's action in receiving the tape to be error.

The statement of Gregg that the cassette recording was his work product is to be accepted. It ties the preparation of the tape to Jones. Gregg's efforts were on behalf of his client, Jones, and this raises a formidable reason for rejecting Jones' contention that the case should be reversed on account of Gregg's activities on behalf of his client Jones. The fact that it proved to be ill-designed strategy does not change the result.

We must also take cognizance that a similar tape was made of the witness Peggy Hines, who said that she had talked to defendant Jones on the telephone and that Jones had asked her to contact his attorney Gregg and that she had gone to Gregg's office and there recorded a statement recanting all of her prior testimony wherein she had said that she had bought heroin from Jones. Appellant Jones was allegedly at Gregg's office at the time of the making of the tape. At trial, of course, she repudiated the statement made on the cassette, saying that it was a lie.

It is not argued by Jones that Gregg's representation was incompetent. The emphasis by different counsel centers on the proposition that Miller was guilty of accusing Jones of tampering with the witness. Our view of the foregoing is that Gregg opened up this entire collateral proceeding and that he did so in the hope that he would be able to discredit the witness Hulsey. In fact, he insisted on putting the cassette tape in evidence. He thus opened the door to the entire matter having to do with the

Hulsey tape and the circumstances under which it was made, and this was a trial strategy decision on his part. So, therefore, Jones cannot, on the one hand, seek to exploit this collateral evidence for his own purposes and at the same time take advantage of it for getting a mistrial or a reversal. In *Samuels v. United States*, 397 F.2d 31 (10th Cir. 1968), we recognized that the "fabrication of evidence of innocence is cogent evidence of guilt." *Id.* at 32. The evidence was not, therefore, irrelevant from the prosecutor's viewpoint.

■ It is, of course, improper for the district attorney to imply that defense counsel has been involved in subornation of perjury, particularly in the absence of evidence that he had. *See Weathers v. United States*, 117 F.2d 585 (5th Cir. 1941), *cert. denied*, 316 U.S. 681, 62 S.Ct. 1267, 86 L.Ed. 1754 (1942); *United States v. Agueci*, 310 F.2d 817 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963). The cases cited were unlike our case in that evidence was lacking to support the accusations and insinuations. In this case there was actual proof of an attempt to change testimony previously given.

■ Specific reference is made by Jones to Miller's emphasizing by repetition the testimony of Hulsey that she delivered a drug to Gregg's law office. Hulsey referred to her previous testimony and repudiated it. This repudiation was contained in the embattled tape. Since Gregg introduced this tape, Miller was entitled to question Hulsey about it on recross-examination. Since, however, it was collateral to the main case, the recross-examination should have been more carefully controlled. The court could have limited this testimony to the matter of rehabilitating the testimony of Hulsey. Going beyond this object constitutes prosecutorial misconduct. Thus to assert in argument that counsel for the defense was an accomplice in the crime being tried would constitute misconduct. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

■ The final question is whether the emphasis placed by the district attorney on this testimony of Hulsey that she delivered narcotics to Gregg at his office gives Jones a right to reversal. Given the fact that it was appropriate for Miller to bring it out in connection with restoring Hulsey's testimony, does the emphasis of it by Miller in an apparent effort to exploit it constitute a basis for reversal? We conclude that it does not. If we were to reverse on this ground, the reversal would be primarily a sanction against Miller. Jones argues that Miller's conduct in emphasizing and perhaps exploiting the testimony of Hulsey that she delivered narcotics to Gregg's office constitutes a basis for reversal. We do not agree. Jones' counsel in an effort to discredit Hulsey as a witness effectively created the condition. We are unwilling, in view of that fact, to reverse the cause on that account.

## IV.

### WAS IT ERROR TO DENY THE MOTION OF JONES FOR A SEVERANCE?

■■ Jones maintains that the decision to join all of these defendants was improper under Rule 8(b) of the Fed.R.Crim.Proc. The limiting standard of Rule 8(b) is in terms of misjoinder unless the several defendants have participated in "the same act or transaction or in the same series of acts or transactions" constituting the offense. Jones argues that the evidence against the other defendants constituted unrelated acts applicable to the other defendants. Jones overlooks that the evidence showed that he and the others were part of a single conspiracy in which he had a major role. The evidence established that Jones was directly involved in the importation of heroin in conjunction with the defendant Heath, who was convicted at a prior trial. It was Jones who originally (in June or July of 1975) solicited Hulsey to transport heroin from Mexico. He and Hulsey flew from Oklaho-

ma City to Tucson in the summer of 1975 and they rented a car and drove to Nogales, Mexico, where they met Roger Sanders. Hulsey accepted a package from Sanders and smuggled it across the border. Hulsey testified after this first trip that she crossed the border numerous times for either Sanders or Jones. Thus there is ample evidence that Jones' role in the conspiracy was extensive; so there is scant basis for his contending that it was error, judged by Rule 8(b), *supra*, to join him in the indictment in which the other defendants were named. The fact that the charge is conspiracy and that the evidence showed the necessary interrelationships justifies the joinder, and the fact that there was not a direct connection between all of the defendants does not require that there be a severance where as here, there is shown to be a general interrelationship. *See United States v. Jorgenson*, 451 F.2d 516 (10th Cir. 1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972); *United States v. Bryant*, 364 F.2d 598 (4th Cir. 1966); 8 *Moore's Federal Practice* § 8.06[2]. *Cf. Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

## V.

### WAS IT ERROR FOR THE COURT TO DENY THE MOTIONS FOR SEVERANCE INTERPOSED BY THE DEFENDANTS OTHER THAN JONES?

The defendants-appellants Hyams, the Jankos and the Ramseys contend that the trial court erred in denying their motion for severance when the evidence discussed above concerning the conduct of attorney Gregg was brought out. They say that there was an accusation of witness tampering and of delivering of cocaine to Gregg, and that the jury heard extensive evidence concerning this activity including the proposal to Hulsey that she was to receive $5,000 with an automobile for changing her testimony on the tape, which tape was in the possession of Gregg when he cross-examined her. The jury, they say, heard all about how the tape was made by Kralik and Gregg in Tulsa and switched tapes with Sneed, whereby he got a blank one. That, together with the testimony concerning how Hines stated that she lied on a tape which she gave to Carroll Gregg, having received assurances from Gregg through a third person that she would not have to testify in court again.

The defendants-appellants concede that evidence which relates only to one co-defendant is not per se improper under *United States v. Pauldino*, 443 F.2d 1108 (10th Cir. 1971), *cert. denied*, 404 U.S. 882, 92 S.Ct. 212, 30 L.Ed.2d 163 (1971). It is said that notwithstanding the cautionary instruction of the court the severance should have been granted. They rely on *United States v. Clark*, 480 F.2d 1249 (5th Cir. 1973); *United States v. Tanner*, 471 F.2d 128 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972); and *United States v. Scott*, 555 F.2d 522 (5th Cir. 1977).

The cases cited make a distinction as to the prejudicial effect of testimony that does not bear directly on the guilt of the complaining defendants. Thus where the evidence relied on for severance is peculiarly damning to the person against whom it is relevant and at the same time particularly unrelated to the remaining defendants, there do not exist the same reasons for granting a mistrial or a severance.

■ We conclude that the evidence in this case is not of such a nature that it prejudices these defendants. Rule 14, the rule relied on, states that if the defendant or the government is prejudiced by joinder of offenses or defendants in an indictment or by joinder for trial, the court may grant a severance of defendants or provide whatever other relief justice requires. This Rule recognizes that the granting or denial of such a motion is within the discretion of the trial court.

■ There was a valid basis for the trial court's denial of the motion. We are con-

vinced that the cautionary instructions given by the court, together with the fact that the evidence in its nature and character was so applicable to Jones and so plainly inapplicable to the remaining defendants, so as to preclude the necessity for granting the severance motion.

## VI.

### WHETHER THE TRIAL COURT ERRED IN DENYING THE OFFER OF JONES TO INTRODUCE THE TAPE OF PEGGY HINES, WHICH SUPPOSEDLY CONTRADICTED HER TESTIMONY GIVEN AT THE PREVIOUS TRIAL THAT SHE HAD HAD HEROIN DEALINGS WITH JONES

■ Immediately following the testimony of Peggy Hines, attorney Gregg denied having the cassette tape that was made in his office or, for that matter, knowing anything about it. However, when it came time to put on his own defense, he sought to introduce it and the court denied the offer. Inasmuch as Hines had admitted making a prior inconsistent tape statement, that is when the tape was made, the court's ruling is not erroneous because the tape would have been cumulative. The principle is that where it is sought to impeach a witness by showing a prior inconsistent statement and the witness admits the prior inconsistent statement, the witness is thereby impeached and further testimony is not necessary. *United States v. Eaton*, 485 F.2d 102 (10th Cir. 1973); *United States v. Roger*, 465 F.2d 996 (5th Cir.), *cert. denied*, 409 U.S. 1047, 93 S.Ct. 517, 34 L.Ed.2d 498 (1972); *Ditrich v. United States*, 243 F.2d 729 (10th Cir. 1957).

■ Other contentions are raised regarding limitations on defense evidence. These, however, are not advanced as specific points. They are referred to in the statement of the case. Gregg said that he had witnesses to testify that Jones had not been in Gregg's office when Peggy Hines made the tape. She had said that Jones was there. The court was of the opinion that Gregg should have presented the evidence which discredited or impeached Hines' testimony at the time rather than making it a matter of defense. If the case were to be retried and such witnesses were to be presented, our disposition would be to direct the trial court to receive testimony. However, the record is so vague concerning the matter in issue and it is so collateral in its nature, that we are unable to perceive serious error in the rejection of the general offer.

The other defendants argue that *they* were prejudiced by this. We conclude that they have no interest in the issue.

\* \* \* \* \* \*

■ Finally, we consider whether the evidence is sufficient against Jones to support the charge of importation of heroin on or about the 29th of September 1975. The question that Jones stresses is that Hulsey had some confusion about dates and that no such transaction occurred on September 29. But the important point is that she testified unequivocally that about this time Jones and Heath supplied money to her with which she bought heroin in Mexico. She then brought it to Roger Sanders for cutting and thereupon delivered the cut heroin to Heath and Jones. This is sufficient proof.

We are convinced that the record is free of substantial error, and accordingly we conclude that the judgments should be and the same are hereby affirmed.