**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Martin BLITSTEIN,
Defendant-Appellant.**

No. 78–2037.

United States Court of Appeals,
Tenth Circuit.

Argued May 9, 1980.

Decided July 14, 1980.

Rehearing Denied Sept. 17, 1980.

Charles Louis Roberts, El Paso, Tex. (Arthur W. Tifford and Melvyn Kessler, Miami, Fla., with him on briefs), for defendant-appellant.

Daniel R. Christopher, Asst. U. S. Atty. (Joseph Dolan, U. S. Atty., and Richard S. Vermeire, Asst. U. S. Atty., Denver, Colo., on brief), for plaintiff-appellee.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Martin Blitstein (Blitstein), a member of the Florida state bar, appeals from a jury conviction and subsequent sentencing judgment following verdicts of guilty on Counts II and V of an original five count indictment. Count II charged Blitstein with violating 18 U.S.C.A. § 1343 (wire fraud) and Count V charged him with violating 18 U.S.C.A. § 1952 (the Travel Act) undertaken in violation of 18 U.S.C.A. § 875(d) (extortion).

*The Indictment as to Counts II and V*

Blitstein was, as previously noted, found guilty of the charges contained in Counts II and V of the original five count indictment. Counts II and V charged:

*Count II: Wire Fraud:*

Paragraph One (1) of this count realleged all of the allegations contained in Count I except those contained in paragraph 4, which, in capsule form, charged that Blitstein and Kim Pease (Pease) "devised and intended to devise a scheme and artifice to defraud and for obtaining money by false and fraudulent pretenses, representations and promises from Clifford DeYoung, well knowing at the time that the said pretenses, representations and promises . . . would be false and fraudulent when made" [R., Vol. I, p. 1]. The following false representations were specified: 1) a warrant was about to be issued for DeYoung's arrest on charges of cocaine possession; 2) Colorado law made no distinction between possession of small amounts of narcotics for private use and possessing large amounts for the purpose of sale or distribution; 3) on Monday, September 18, 1978, a warrant was issued by Colorado authorities for De-Young's arrest, and if arrested, DeYoung would be placed in chains and pulled off the movie set and embarrassed in the presence of his friends and fellow workers; 4) Blitstein and Pease could "take care" of the arrest warrant, criminal case and adverse publicity if they received a total of $25,-000.00, which request was reduced to $15,-000.00; 5) Blitstein and Pease had associates who could somehow dispose of the narcotics so that no case could be filed; and 6) through the efforts of Blitstein and Pease the criminal case involving DeYoung had been terminated.

Paragraph Two (2) of this count charged that Blitstein and Pease, "On or about September 18, 1978, in the State and District of Colorado, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, transmitted and caused to be transmitted certain sounds by means of wire communications in interstate commerce, namely a telephone conversation between a telephone located in Colorado and a telephone located in California, all in violation of Title 18, United States Code, Sections 1343 and 2." [R., Vol. I, p. 3].

*Count V: Travel to Commit Extortion:*

This count charged that "On or about September 15, 1978, in the State and District of Colorado, and elsewhere, Martin Blitstein and Kim Pease, did travel and cause travel of Martin Blitstein and Kim Pease in interstate commerce from Colorado to California, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to-wit: extortion in violation of Title 18, United States Code, Section 875, and thereafter did perform and attempt to perform acts to promote, manage, carry on and facilitate the promotion, management and carrying on of said unlawful activity, all in violation of Title 18, United States Code, sections 1952 and 2". [R., Vol. I, p. 5].

*Factual Background*

■ On appeal, we must view the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, in the light most favorable to the government following a conviction. *United States v. Freeman,* 514 F.2d 1184 (10th Cir. 1975); *United States v. Twilligear,* 460 F.2d 79 (10th Cir. 1972).

Clifford DeYoung, an actor by profession, arrived at Stapleton International Airport in Denver, Colorado, on September 9, 1978, from Greeley, Colorado, where he had been on location during filming of the NBC television movie "Centennial". He planned to fly to his home near Los Angeles, California. Following a routine x-ray search of his hand carried baggage, DeYoung consented to a general weapons check of the baggage. The security guard conducting that check discovered a small vial containing a substance later identified as less than one gram of cocaine. The vial was confiscated by airport security personnel after one of the guards attached to the security unit questioned DeYoung briefly about his occupation and ownership of the vial. DeYoung

acknowledged ownership. He was permitted to proceed on his flight because security officials were unable to locate a field testing "kit" for the purpose of identifying the substance in the vial. A member of the security force, Detective Handley, informed DeYoung that he would be contacted if an analysis of the substance in the vial determined it to be a controlled substance and if there was a "sufficient amount for filing of a case". [R., Vol. VII, p. 61]. Handley thereafter delivered the vial to the Denver Police Department for analysis of its contents. Significantly, an "offense report" was not prepared until September 25, 1978, and at no time during the period from the airport incident of September 9, 1978, until September 25, 1978, was Detective Handley contacted by either Blitstein or his paralegal, Pease. [R., Vol. VII, p. 78].

After DeYoung arrived in California, he contacted his business attorney about the matter, expressing his concern and his need for a good lawyer in Denver. Several days later DeYoung was referred to Blitstein, whose office was located in Vail, Colorado. DeYoung phoned Blitstein in Vail on September 12, 1978, and, after relating the circumstances to Blitstein, DeYoung was given assurances by Blitstein that he would "check into it" and contact him further. DeYoung informed Blitstein during this initial conversation that he owned and possessed the miniscule amount of cocaine contained in the vial found in his hand baggage and knew it to be contraband. Blitstein informed DeYoung that "they" could come down real hard on him if they wanted to, and that he might be in a lot of trouble.

On September 14, 1978, during a telephone conversation, Blitstein advised DeYoung that the laboratory analysis of the contents of the vial had come back "positive", i. e., cocaine, and that if DeYoung sent him $5,000.00 immediately as a legal retainer, Blitstein would represent him. DeYoung complied by wiring Blitstein $5,000.00 that same day. The record shows that it was not until the following day, however, that Blitstein in fact inquired of the Denver Police Department's Vice and Narcotics squad about DeYoung's case and

the results of the test. It was then that Lieutenant Steve Metros informed Blitstein that the substance tested positive as cocaine and that Blitstein should contact a Detective Costigan to determine whether DeYoung would be "filed on". [R., Vol. III, pp. 4-6].

On September 15, 1978, Blitstein's paralegal, Pease, phoned DeYoung in California and informed him that he was going to be placed under arrest and that the case was very serious. She stated that because of the seriousness of the case she and Blitstein had to fly to California to confer with DeYoung face to face. Neither Pease nor Blitstein had contacted Detective Costigan at that time or before they left for California that same day. DeYoung met them at the Los Angeles airport and drove them to his home. Enroute, Blitstein informed DeYoung that his fee would be $25,000.00 to handle the case. There are discrepancies in the testimony with respect to what was said during the course of the meeting in California. However, the jury obviously believed the following testimony of DeYoung, which was substantially corroborated by another witness:

While driving to DeYoung's home, and after Blitstein stated that his fee for representing DeYoung would be $25,000.00, DeYoung replied that this was "pretty steep". Blitstein responded that he was giving DeYoung a "break" inasmuch as his regular fee would be $50,000.00. Pease then remarked that Blitstein was the greatest drug lawyer in the country. At DeYoung's residence, Blitstein discussed with DeYoung various legal defenses which should be considered and Blitstein stated that DeYoung was facing from three to fifteen years in prison because Colorado law does not distinguish between a person "caught" with a small amount of cocaine for personal use and a large amount held for sale. Blitstein also related to DeYoung aspects of his legal career, stating that there were people who wished to make a movie of his life. The following morning, Pease asked DeYoung for $20,000.00. DeYoung replied that he did not have that much money in the bank.

Pease then instructed DeYoung to make out two checks payable to Blitstein—one in amount of $7,500.00 and one in amount of $2,500.00. DeYoung complied. Blitstein and Pease departed.

The following day, DeYoung phoned Michael Dowling, a Colorado attorney, and DeYoung's cousin, David B. Davis, a California attorney specializing in criminal law. Davis advised him to stop payment on the two checks he had written payable to Blitstein. DeYoung did so, and shortly thereafter he received a phone call from a Paul Meyer, who identified himself as a financial partner of Blitstein. Meyer inquired why DeYoung had stopped payment on the two checks. Later, Blitstein and Pease phoned DeYoung. Blitstein told DeYoung that a warrant for his arrest had been issued and that DeYoung should "reinstate" the money so that Blitstein could defend him. Blitstein warned DeYoung that the minute he arrived at the Denver airport there would be a policeman waiting for him and that the police would come out to the movie location set and drag him off in chains because the police are animals and would like to humiliate him. DeYoung then stated to Blitstein that he would provide the money, but that he wanted Blitstein to speak with his cousin, attorney Davis. Blitstein phoned Davis, who told Blitstein that he believed Blitstein had acted unprofessionally by reason of his flight to California and his subsequent coercion and intimidation of DeYoung. Further, Davis stated that Blitstein's telephone remarks to DeYoung that an arrest warrant had been issued and that DeYoung would go to prison were unprofessional, coercive and intimidating. Pease came on the line and said to Davis that Blitstein was a great and competent lawyer, highly experienced in criminal law and the "biggest dope lawyer in this area". Blitstein told Davis that he had reduced DeYoung's fee to $25,000.00 because he liked him, that time was of the essence, and that unless DeYoung made the checks good within the next two hours, there would be a warrant issued for DeYoung's arrest. Blitstein said "once the evidence leaves Denver" [for Miami] he could not control it any longer. When Davis asked what he meant, Blitstein said that the evidence was going to be analyzed in Miami and "his people" could take care of it but it would have to be done within the next two hours. This telephone conversation terminated when Blitstein asked Davis what he planned to tell DeYoung. Davis responded that it was none of Blitstein's business. Thereafter, Davis phoned DeYoung and advised him that he was getting "ripped off" and that there was "no evidence there is a case".

Blitstein phoned DeYoung again and stated that Davis was a fool, an incompetent who knew nothing about Colorado law. DeYoung then reinstated the checks and so informed Blitstein, who advised DeYoung to wire the money. Blitstein congratulated DeYoung and remarked that DeYoung would now have nothing to worry about. DeYoung thereafter spoke with Attorney Dowling of Telluride, Colorado, and again stopped payment on the checks in question. At a later date, Pease contacted DeYoung at a Denver motel and remarked to him that he was heading for jail before Blitstein got him off. The testimony of attorney Davis, DeYoung's cousin, was corroborative of a substantial and significant portion of DeYoung's testimony.

Blitstein testified in his own defense to the following: After obtaining the $5,000.00 retainer from DeYoung on September 14, 1978, he contacted an officer with the Denver Police Department Vice and Narcotic Section the following day and learned that the forensic laboratory test showed that the vial contained cocaine and that a warrant would probably issue; Blitstein was told he should contact the agent in charge, Mr. Costigan; within an hour, Blitstein phoned DeYoung and advised him of the police report and arranged the meeting in California; during the personal conferences in California with DeYoung, Blitstein simply explained to DeYoung what could happen if he were prosecuted and advised that there were certain procedures which could be used to avoid "public" arrest; he denied stating to DeYoung that he made any of the alleged material misrepre-

sentations contained in the indictment (as testified to by DeYoung, and corroborated in substantial part by Davis) and, instead, he stated that he requested the $25,000.00 fee in order to represent DeYoung on that which he believed to be an impending prosecution.

Blitstein further testified that: He did not at any time represent to DeYoung or Davis that a warrant had been issued by Colorado officials for DeYoung's arrest involving the drug charge; the $25,000.00 fee would have involved all legal representation of DeYoung involving issuance of a warrant, pretrial motions, and trial; he would make every effort to see that DeYoung's arrest be accomplished quietly so as to avoid embarrassment and undue publicity; and during the telephone conversation of September 18, 1978, he informed DeYoung that no warrant had been issued and no charges filed against him as of that date and that he (Blitstein) was happy about it.

Detective Costigan, to whom Blitstein was referred for the purpose of determining whether any charges would be filed against DeYoung, testified that he was never contacted by Blitstein or Pease. [R., Vol. VII, p. 139]. One David Neff, a Deputy United States Marshal, testified that he spoke with Pease on September 14th and 15th and informed her that there was no federal warrant outstanding for DeYoung. [R., Vol. VIII, pp. 211, 217].

### Trial Court's Instructions

The trial court's instructions, which are not challenged on appeal, were prefaced by the Court's preliminary advisement to the jury that their basic function is "a search for the truth." The Court instructed, *inter alia*, that: The jurors were the sole judges of the facts; the defendant is cloaked with the presumption of innocence throughout trial and must be acquitted unless the jurors are satisfied beyond a reasonable doubt of his guilt after a careful and impartial consideration of all the evidence in the case; in deciding the case, the jury must consider both direct and circumstantial evidence; the words "scheme and artifice" as used in

the statute include a plan or course of action intended to deceive others, and to obtain by false and fraudulent pretenses, representations or promises money or property from the persons so deceived; a statement or representation is false or fraudulent within the meaning of the statute if known to be untrue or made with reckless indifference as to its truth or falsity and made or caused to be made with the intent to deceive; *a false or fraudulent representation may be made by statements of half-truths or the concealment of material facts as well as by affirmative statements of facts*; if the jury should find that the statements and representations made by the defendant over the wire were made with a good faith belief in their truth, the jury should acquit the defendant; under the extortion count (Count V) the jury must find that the defendant, following the interstate travel from Colorado to California, performed acts of extortion by threatening to cause the arrest of DeYoung for the purpose of influencing him to pay money; and that the term "fear" in relation to extortion or threat to extort does not necessarily refer to physical fear or fear of violence but includes fear of economic loss or an adverse effect upon a profession or reputation. [R., Vol. XII, pp. 915–941].

### Issues on Appeal

On appeal, Blitstein contends that his conviction should be set aside in that: (1) The facts are insufficient as a matter of law to sustain his conviction due to (a) insufficiency of evidence that he devised or practiced a scheme to defraud, (b) insufficiency of evidence that he extorted or attempted to extort money from DeYoung, and (c) insufficiency of evidence that he traveled in interstate commerce on September 15, 1978, with intent to carry on extortion on September 18, 1978; (2) the totality of the circumstances in this case constitutes selective prosecution of an attorney specializing in criminal defense cases for his financial arrangements with clients such as to merit dismissing the indictment; (3) the totality of the circumstances in this case

constitutes prosecutorial misconduct by way of reprisal and vindictiveness based upon previous history between Blitstein and the federal prosecutors justifying dismissal of the indictment; (4) venue was not properly laid in the District Court as to Count V of the Indictment, since the undisputed facts establish that the District of Colorado was the district from which Blitstein commenced his travel; (5) the trial court denied Blitstein due process of law and a fair trial by permitting and sanctioning prosecutorial misconduct involving (a) cross-examination of Blitstein concerning undetermined bar charges, and (b) prejudicial argument and inflammatory comments; and (6) the above and foregoing procedural errors, commencing with the denial of Blitstein's motion for a Bill of Particulars, and terminating with the refusal to instruct the jury on the theory of the defense *in tandem*, substantially prejudiced Blitstein and denied him due process of law and a fair trial.

### Discussion and Disposition

### I.

Blitstein contends that the facts are insufficient as a matter of law to sustain his conviction under Counts II and V, with specific failure to establish (a) that he devised or practiced a scheme to defraud, (b) that he extorted or attempted to extort money from DeYoung, and (c) that he traveled in interstate commerce on September 15, 1978, with intent to carry on extortion on September 18, 1978.

■ The evidence in support of the jury's verdict, contrary to Blitstein's contention, is substantial. Failing to attack the weight of the evidence with cogent, convincing argument, Blitstein instead has sounded the alarm on behalf of the entire criminal defense bar in contending that if the procedure exercised by Blitstein in this case be fraud, ". . . this court . . . [should] quickly forewarn the Criminal Defense Bar." [Reply Brief of appellant, p. 8]. Again: "Simply stated: Mr. Blitstein found not a single published opinion of law previously determining or reviewing a lower court judgment determining that an attor-

ney's insistence on the pre-payment of a fee, especially when working on criminal defense matters, demonstrated an intent to defraud." [Opening Brief of appellant, p. 19]. We are unimpressed. The clarion call rings hollow before this Court. The protest of concern for the "Criminal Defense Bar" is, in our view, unrepresentative of those who honor their status as officers of the court.

A complete review of the record establishes that the evidence, direct and circumstantial, together with all reasonable inferences to be drawn therefrom, firmly and substantially supports the jury's verdict. Blitstein defrauded his client, DeYoung, by means of a series of sordid acts, practices and pretenses which, in totality, can fairly be defined as lies, blatant misrepresentations, and a scheme designed to cheat. The learned trial judge, at the hearing for final disposition following trial, said it all:

I know what it means to a lawyer because I have been one for over fifty years, but I have consistently felt that those of the so-called white collar group who commit offenses against the laws of either the state or the nation should be punished just as those in the so-called blue collar group or some of those who are less fortunate that we sometimes characterize as the derelicts of society.

Yes, you have had a good education. You climbed high, in a relatively short time, but there is a bigger obligation on the part of those who reach heights such as you have, than there is of those who have never been able, for whatever reason, to reach any height of success.

I am of the opinion, sir, from the evidence in this case, that you have treated the practice of law as a business rather than as a profession. Most lawyers are mighty proud of being lawyers and we have to act with propriety each day to gain any respect from the populace, from the people.

Lawyers are too much looked down upon and often unjustly, but when we convert what is an important profession to a business where we reach out for

money—I have heard you say that you have never turned down a client because they weren't able to pay.

MR. BLITSTEIN: Yes, sir.

THE COURT: But I have heard the evidence in this case where you sought first $50,000, $25,000, down to $15,000, and you did get $5,000 in cash, and there was no case filed against Mr. DeYoung in any court in connection with the transaction that occurred at Stapleton Airport on September 9, 1978.

\* \* \* \* \* \*

You didn't make any threats in the sense of injuring a person physically. There was certainly some evidence that the man was not only in fear because of the circumstances in which he found himself, but that that fear increased because of the statements which you, the evidence showed, made to him regarding the probable consequences of his act.

This is not the first time that I have had the unpleasant task of sentencing a colleague at the bar, a lawyer, but we must hold ourselves up to the highest degree of recognizing that the law applies to every man, and I underline every man, regardless of his position in life, his status, his economic condition, his education or his upbringing.

[R., Transcript of Proceedings, December 19, 1978, pp. 7–9].

The trial court entered concurrent sentences of two years on each count, but directed that all but six months thereof be suspended and that the six months be served in a treatment type institution, and that at the conclusion of that period Blitstein be placed on probation for the balance of the term. The Court also assessed a fine of $1,000.00 on Count II and $2,000.00 on Count V.

■ High standards of moral and ethical conduct have historically been imposed upon members of the legal profession, regardless of their expertise and status among their peers. Those who use the tools of the legal profession to prostitute its high standards of ethical and moral conduct serve only to destroy the admirable goals and aims of our criminal justice system. Appellant Blitstein's conduct in the case at bar was demeaning of his obligation to serve the public good.

## II.

■ Blitstein's contentions that the "totality of the circumstances" constitutes selective prosecution of an attorney specializing in criminal defense cases, and shows prosecutorial misconduct by way of reprisal and vindictiveness based upon previous history between Blitstein and federal prosecutors justifying dismissal of the indictment, border on the frivolous. The contentions do not find support in the record. Beyond this, these contentions are made by insinuation, innuendo, and completely unfounded, wholly speculative "opinions" advanced both in the briefs and in the course of oral argument.

That there existed prior "friction" and strained relations between Blitstein and members of the staff of the United States Attorney for the District of Colorado appears to be true and somewhat interesting, but it is no more than that. In the give-and-take of legislative combat, it is hardly news to learn that the zeal of opposing counsel results in heated head-to-head combat.

We are not impressed by Blitstein's effort to present himself as the "target" for selective and vindictive prosecution because of his previous "entanglements" with the office of the United States Attorney. Attached to Blitstein's Motion for Change of Venue or Continuance Based Upon Prejudicial Pre-Trial Publicity is an Exhibit "I" consisting of an article appearing in the *Rocky Mountain News* which relates that Chief Judge Fred M. Winner of the United States District Court for the District of Colorado dismissed a charge lodged by Blitstein that he had been intimidated by the United States Attorney's office leading to the instant indictment. The article reads in part:

Winner said Blitstein's allegations were "a contrived charade and a ploy" aimed

at playing "games with the court and with our system of justice."

Blitstein, who is under federal indictment for extortion and wire fraud, claimed he was intimidated by the U.S. attorney's office during the drug trial of Breckenridge dentist Jeffrey Mortenson, who later was acquitted.

\*     \*     \*     \*     \*     \*

During the dentist's trial, Blitstein accused Assistant U.S. Attorney Nancy Rice of making false statements. During a recess, Assistant U.S. Attorney Richard Stuckey told Blitstein that he resented the accusation against Ms. Rice and if it happened again, he would take Blitstein "to the mat—hard."

\*     \*     \*     \*     \*     \*

But in a sharply worded eight-page opinion, Winner said, "If Mr. Blitstein is so easily intimidated, he should retire from the trial bar. . . . If a statement by an opposing lawyer saying that something will be vigorously pursued drives a lawyer from a case, that lawyer should confine his practice to office work, and he certainly should not try criminal cases in 40 federal courts in a short span of 10 years" (as Blitstein claimed he had).

\*     \*     \*     \*     \*     \*

"From my personal observation, 'intimidated counsel' has been in the pits before and he can take good care of himself in a rough and tumble trial", Winner said. [R., Vol. I, p. 49].

We echo the views expressed by Chief Judge Winner. We find them quite applicable to the "vindictive and selective" contention advanced by Blitstein on this appeal, particularly inasmuch as this record is absolutely barren of any proof that the Government failed or refused to prosecute others similarly situated to Blitstein. It is the obligation of a criminal defendant to demonstrate that the government's prosecution of him was based upon clearly impermissible discriminatory grounds such as race, religion or his exercise of first amendment rights to free speech. *United States v. Moss*, 604 F.2d 569 (8th Cir. 1979), U.S.

App.Pndg.; *United States v. Torquato*, 602 F.2d 564 (3d Cir. 1979), *cert. denied* 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307. And mere failure to prosecute other offenders is no basis for a finding of denial of equal protection. The conscious exercise of some selectivity in enforcement is not per se a federal constitution violation. *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Cook v. City of Price, Carbon Cty., Utah*, 566 F.2d 699 (10th Cir. 1977); *United States v. Brookshire*, 514 F.2d 786 (10th Cir. 1975). Moreover, there is a presumption that prosecution for violation of the criminal law is in good faith. *United States v. Bennett*, 539 F.2d 45 (10th Cir. 1976), *cert. denied* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

In light of the record before us and given the fact that Blitstein was found guilty by an impartial jury of the violations charged in Counts II and V based on the evidence adduced, we hold that the presumption of good faith is firmly established. The trial court did not err, following an evidentiary hearing, in ruling that the instant prosecution did not deny Blitstein equal protection of the law and was not vindictive.

### III.

Blitstein argues that venue was not properly laid in the District Court as to Count V of the Indictment inasmuch as the undisputed facts established that the District of Colorado was the district from which Blitstein commenced his travel. He relies upon *Spinelli v. United States*, 382 F.2d 871 (8th Cir. 1967), *rev'd on other grounds*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) for the proposition that a substantive violation under the Travel Act statute occurs after the travel took place, i. e., actual crossing of the state line. We decline to adopt the *Spinelli* interpretation of the statute. In our view, venue was properly laid in the United States District Court for the District of Colorado.

We are persuaded that the interpretation of the Travel Act venue statutes set forth in *United States v. Polizzi*, 500 F.2d

856 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975), is correct. The court there held that ". . . a defendant can be prosecuted for traveling in violation of section 1952, or for aiding and abetting such travel, in any district in which the travel occurred." 500 F.2d at p. 899.

This Court observed in *United States v. Villano*, 529 F.2d 1046 (10th Cir. 1976), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976) that the Travel Act statute covers those who travel in interstate commerce or use interstate facilities with the intent to promote unlawful activity. The plain language of the statute covers the activity charged to Blitstein in the case at bar. In pertinent part it reads:

18 U.S.C. § 1952:

Whoever travels . . . or uses any facility in interstate or foreign commerce, including the mail, with intent to . . . (3) otherwise promote, manage, establish or carry on, . . . any unlawful activity, and thereafter performs or attempts to perform any of the acts specified . . . shall be fined or imprisoned.

(b) as used in this section "unlawful activity" means . . . (2) extortion . . . in violation of the laws of . . . the United States.

In our view, the statute, on its face, encompasses the illegal activity charged to Blitstein. The travel here involved originated in Colorado in order to promote, manage, and carry on the unlawful activity of extortion, i. e., travel from Colorado to California for the purpose of extorting from DeYoung exorbitant fees in a "case" wherein no prosecution had been initiated or any arrest warrant issued.

IV.

We have carefully considered each of the remaining allegations of error advanced by Blitstein and hold that they are, individually and cumulatively, without merit.

▆▆▆▆ During his direct examination, Blitstein testified at length that: He was a litigation specialist with extensive experience in the criminal practice, primarily as a drug defense attorney who had appeared in many, many courts since he was admitted as a member of the Florida bar in 1968 [R., Vol. X, p. 586]; his fee schedule for narcotics violations "be they large or small" was $50,000.00 and his per diem rate out of his Miami law office was $3,000.00 [R., Vol. X, pp. 622, 623]; that he was not a member of the Colorado bar and would have to retain local counsel out of a portion of his fee [R., Vol. X, p. 623]; that in the past ten years he had accumulated in excess of a million dollars in unpaid bills [R., Vol. X, p. 627]; and that he was not a "run-of-the-mill" inexpensive lawyer. [R., Vol. X, p. 636]. Thus, Blitstein did not hesitate to elevate himself as a member of the bar with outstanding credentials and reputation. On cross-examination, Blitstein was asked "there was a period of 45 days during that period (since his admission to the Florida bar in 1968), was there not, when your license to practice was suspended?", to which Blitstein responded, "yes, sir." [R., Vol. XI, p. 720]. The trial court admitted this cross-examination predicated on Blitstein's extensive testimony about his outstanding experience and professional reputation as a specialist in the field of criminal defense, particularly in relation to drug-offense cases, where he was much sought after. The trial court admitted this cross-examination over objection not in relation to Blitstein's "character as such" but probative of the truthfulness or untruthfulness of his status with the professional bar, pursuant to Fed.Rules Evid. rule 608(b), 28 U.S.C.A. No error occurred. Blitstein injected his good reputation as a member of the bar by reason of his extensive testimony aforesaid, thus opening the door to the very limited impeachment evidence which did not in anywise involve criminal proceedings. *Cf. United States v. Heath*, 580 F.2d 1011 (10th Cir. 1978), *cert. denied, Babb v. U. S.*, 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979). The extent of cross-examination is a matter within the trial court's discretion which will not be disturbed in the absence of proof of abuse of discretion. *United*

States v. Speir, 564 F.2d 934 (10th Cir. 1977), cert. denied, 435 U.S. 927, 98 S.Ct. 1495, 55 L.Ed.2d 521 (1978); United States v. Hodges, 480 F.2d 229 (10th Cir. 1973). See also: United States v. Giese, 597 F.2d 1170 (9th Cir. 1979), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405.

■ There is nothing in this record evidencing prosecutorial misconduct. The record must show prosecutorial misconduct rising to the level of plain error in the absence of an objection or request for corrective instructions. United States v. Jones, 578 F.2d 1332 (10th Cir. 1978), cert. denied, 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259 (1978); United States v. Bishop, 534 F.2d 214 (10th Cir. 1976); Fed.Rules Cr.Proc., rule 52(b), 18 U.S.C.A.

■ The totality of the Government's evidence was strong. Where the evidence against the accused is strong, the appellant must show that the prejudice he claims constitutes plain error. Hall v. United States, 404 F.2d 1367 (10th Cir. 1969). A conviction will not be disturbed on appeal where it is clear, after a careful review of the whole record, that the alleged errors did not deprive the appellant of his substantial rights. United States v. Bishop, supra; United States v. Lemon, 497 F.2d 854 (10th Cir. 1974). Such is the case here. Cf. United States v. Williams, 445 F.2d 421 (10th Cir. 1971), cert. denied, 404 U.S. 966, 91 S.Ct. 342, 30 L.Ed.2d 286 (1971). A review of the record satisfies us that Blitstein received a fair trial.

The remaining issues raised by Blitstein which have not been specially addressed or discussed have been considered. We hold that they are legally insubstantial. United States v. Brown, 600 F.2d 248 (10th Cir. 1979), cert. denied, 444 U.S. 917, 100 S.Ct. 233, 62 L.Ed.2d 172 (1979); United States v. Porth, 426 F.2d 519 (10th Cir. 1970), cert. denied, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970).

WE AFFIRM.

WILLIAM E. DOYLE, Circuit Judge, specially concurring.

I concur fully in the judgment. Although I agree with the legal conclusions of the majority and am also in agreement with the reasoning contained in the majority opinion, I am unable to subscribe to the entire opinion. My disagreement is with the characterizations of the defendant personally that are found in the majority opinion. It is only because they are unnecessary and not because I am sympathetic to the defendant.

The appellant is not before us in a disbarment proceeding, and although I can understand the desire of the majority to emphasize that as a member of the bar he should have observed the high standards which the profession exacts, the facts here speak for themselves and render it unnecessary to add to the lengthy and explicit statement of the evidence and to the legal effects which flow from that description.