**John Joseph ROMANO, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–87–441.**

Court of Criminal Appeals of Oklahoma.

Jan. 13, 1993.

Rehearing Denied March 17, 1993.

Cindy Foley, Tim Wilson, Asst. Public Defenders, Oklahoma City, Trial Counsel for appellant.

Lee Ann Jones Peters, Chief, Appellate Div., William C. Devinney, Asst. Appellate Public Defender, Oklahoma City, Appellate Counsel for appellant.

Robert Macy, Dist. Atty., Lou Keel, Greg Ryan, Asst. Dist. Attys., Oklahoma City, Trial Counsel for appellee.

Robert H. Henry, Atty. Gen. of Oklahoma, Carol Price Dillingham, Asst. Atty. Gen., Oklahoma City, Appellate Counsel for appellee.

## OPINION

LUMPKIN, Vice–Presiding Judge:

Appellant John Joseph Romano was tried by jury and convicted of Murder in the First Degree (21 O.S.1981, § 701.7) and Robbery with a Dangerous Weapon, After Former Conviction of Two or More Felonies (21 O.S.1981, § 801), Case No. CRF–87–397, in the District Court of Oklahoma County. The jury found the existence of four aggravating circumstances and recommended punishment of death for the murder conviction and one thousand (1000) years imprisonment for the robbery conviction. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.

Appellant and co-defendant David Woodruff were found guilty of the first degree murder of Roger Sarfaty. The decedent's body was discovered on October 16, 1985, in his apartment in Oklahoma City. The decedent had been beaten, strangled and stabbed. Further facts will be presented as necessary.

### I. JURY SELECTION ISSUES

Appellant contends that it was reversible error for the trial court to refuse to conduct a hearing as to whether jury foreman McDonald had knowledge of Appellant's involvement in the Lloyd Thompson murder [1] and whether this knowledge

---

1. In January, 1987, Appellant and co-defendant Woodruff were convicted of the first degree

had been communicated to the jury. The record reveals that Mr. Eugene McDonald was one of the original twelve venirepersons called to service. The State's list of witnesses was belatedly read to the jury, preceding the eighth peremptory challenge to the panel. One of the venirepersons stated that he recognized the name "Cheryl Moody" as that of a secretary at his place of employment. Although the prospective juror is not identified by name in the transcript, the Appellant states that it was Mr. McDonald. This is not disputed by the State. The following exchange then took place:

> MR. KEEL: (Prosecutor) In the event she is called to testify in this case, is there anything about the relationship you have had from what you have known of Cheryl Moody, to this point, that you think would make it hard for you to be fair and listen to the testimony. In other words, because of you having known her, would you give her more or less weight her testimony than you would anybody else?
>
> PROSPECTIVE JUROR: No, sir.
>
> MR. KEEL: So you can be fair to both sides in this case in spite of that?
>
> PROSPECTIVE JUROR: I believe so.

(Vol. II, Tr. 193–194)

The defense did not question him further, did not challenge him for cause nor remove him with a peremptory challenge. At that time, Appellant and co-defendant Woodruff each had one (1) peremptory challenge remaining. Both challenges were waived. Mr. McDonald remained on the jury and was ultimately selected as foreman.

On the seventh day of trial, before closing arguments were to be given in the second stage, counsel for Appellant and co-defendant Woodruff asked that the jurors be individually questioned to determine whether during first stage deliberations

they had learned of the defendants' connection with the Thompson murder. It was revealed that Cheryl Moody was the daughter of Lloyd Thompson.

The reason given by defense counsel for the motion was their opinion that the jury did not react appropriately to the State's reading of the bill of particulars and the mention of the convictions for the Thompson murder and the length of time during first stage deliberations.[2] The trial court denied the motion, stating that to grant it would violate the sanctity of the jury.

Appellant now argues in the alternative that failure to hold a hearing to determine whether Mr. McDonald communicated his knowledge to the other jurors was error, the failure to excuse McDonald from the jury was error, and that trial counsel was ineffective for failing to remove him from the jury. We disagree with Appellant's arguments and find no reason for reversal or modification. The record reflects that Mr. McDonald was competent to serve as a juror and that Appellant has failed to show that he was denied a fair trial by Mr. McDonald's service on the jury. The question of the competency of jurors is addressed to the sound discretion of the trial court, and absent an abuse thereof, the finding of the trial court will not be upset on review. *Greathouse v. State*, 503 P.2d 239, 240 (Okl.Cr.1972).

During voir dire, Mr. McDonald clearly indicated that he understood that the defendants were presumed to be innocent of the charges against them; that the State had the burden of proof and if the State did not meet that burden of proving guilt beyond a reasonable doubt, that the defendants' must be found not guilty. He further indicated that he could keep an open mind and listen to all the evidence presented by both the State and the defense and that he knew of no reason why he could not

murder of Lloyd Thompson and sentenced to death.

**2.** The record reflects that the jury began its first stage deliberations on May 22, 1987. Sometime before 6:30 p.m., the jury reported to the trial judge that it was split 6 to 6. The jury was then sent to dinner before resuming its deliberations.

A verdict of guilty was returned that same day. Comments by defense counsel indicate that the jury returned approximately five (5) hours after announcing their deadlock with a guilty verdict, while comments by the trial court indicate it was one hour.

be a fair juror. He assured defense counsel that he would hold the State to its burden of proof and make them prove each and every element, beyond a reasonable doubt, of the crimes charged against the defendants. Mr. McDonald indicated that he could follow the court's instructions as to the law, and that he was not prejudiced against the defendants. (Vol. I, Tr. 83, 154–155, 174)

By failing to exercise his last peremptory challenge, Appellant has waived whatever claim he may have had concerning the partiality or improper makeup of the jury. *See Greathouse*, 503 P.2d at 241 (wherein the trial judge refused to grant a mistrial after a juror indicated that he knew one of the State's witnesses. The conviction was affirmed based on the juror's indication that knowledge of the witness would not affect his partiality. We held that when defense counsel failed to inquire as to the knowledge of the witness by the juror, any error was waived.) *See also Hamilton v. State*, 79 Okl.Cr. 124, 152 P.2d 291, 295 (1944).

 However, due to the nature of Appellant's allegations, we will address the issue further. The jury trial system is founded on the impartiality of a body of peers selected by counsel. Voir dire is the procedure designed to give a criminal defendant the opportunity to explore the opinions and personal knowledge of potential jurors who may ultimately decide his fate. One of the purposes of voir dire is to ensure a criminal defendant's right to a fair and impartial jury. The critical fact to be determined is whether the defendant received a fair trial from jurors who could lay aside any personal opinions and base a verdict on the evidence.

In the present case, the trial court conducted an exhaustive voir dire. Those prospective jurors with preconceived opinions for or against Appellant, who could not set aside those opinions or who had doubts about their ability to be impartial, were excused. The remaining prospective jurors were questioned further as to their knowledge of persons involved in the case. Counsel for the State and for both defendants carefully questioned each prospective juror to make certain that each could and would set aside any emotion he or she might have concerning this case and depend solely on the evidence presented during trial to decide the outcome. As a result, we find that the defendants were left with twelve impartial jurors.

The mere fact that Mr. McDonald knew Lloyd Thompson's daughter does not render him incapable of serving on the jury. A criminal defendant is not entitled to jurors who know nothing about his case. *Hale v. State*, 750 P.2d 130, 134 (Okl.Cr. 1988), *cert. denied*, 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164 (1988); *Brecheen v. State*, 732 P.2d 889, 892 (Okl.Cr.1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 244 (1988); *Wooldridge v. State*, 659 P.2d 943, 946 (Okl.Cr.1983). The constitutional guarantee of a fair and impartial trial does not exclude service by a juror with knowledge of facts and circumstances involving the case, but only those persons who use that knowledge to form opinions concerning the merits of the case, or who form a negative opinion of the defendant based on that knowledge. *Smithey v. State*, 385 P.2d 920, 924 (Okl.Cr.1963).

 Judge Saied's refusal to hold an evidentiary hearing to determine whether or not any improper information had been imparted to the other jurors was a proper determination. In order to establish juror misconduct, "a defendant must show actual prejudice from any alleged jury misconduct and defense counsel's mere speculation and surmise is insufficient upon which to cause reversal". *Chatham v. State*, 712 P.2d 69, 71 (Okl.Cr.1986). *See also Parsons v. State*, 603 P.2d 1144, 1146 (Okl.Cr.1979).

The record in the present case is absolutely barren of anything other than speculation or surmise by defense counsel. Judge Saied, an experienced trial judge, disputed defense counsel's observations on the record. He stated that he observed the jury during the reading of the bill of particulars. At the mention of the prior murder conviction, he noticed two jurors in particular who showed some surprise. He added that he did not think that Mr McDonald

knew of the murder conviction, but if he did, there was nothing to indicate that he had said anything about it to the other members of the jury. Regarding the length of the first stage jury deliberations, he did not find it unusual to have a jury deadlocked 6 to 6 and return a few hours later with a guilty verdict. He further commented:

> [i]f I did this I think I would be violating sanctity of the jury itself. They have deliberated and we have no right to go in and ask how they did it and why they did it. I have given them an admonition every time, a very strong one I think you all know. In fact I add to it more than was actually required by statute, and it has been a very strong admonition in my opinion. I can't invade the province of the jury and ask them his question..... (Vol. VII, Tr. 5)

Whether or not to hold an evidentiary hearing was within the discretion of the trial court. Finding no abuse of that discretion, we find no error.

■ Similarly, we do not find defense counsel's decision to leave Mr. McDonald on the jury indicative of ineffective assistance of counsel; in spite of a comment by the trial judge that he thought Mr. McDonald would be removed by the defense. Counsel admitted that the decision not to remove Mr. McDonald was a part of their trial strategy. In hindsight, it may appear to the Appellant that the strategy may not have been appropriate, but this is not sufficient to meet the test of ineffectiveness established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have previously refused to evaluate the performance of trial counsel on hindsight. *Dunham v. State,* 762 P.2d 969, 975 (Okl.Cr.1988); *Smith v. State,* 650 P.2d 904, 908 (Okl.Cr.1982). Further, through the review of cases on appeal, this court is familiar with trial counsel for both defendants and find them to be experienced, capable capital litigators whose strategic choice to leave Mr. McDonald on the jury was well within the range of professionally reasonable judgment.

We find that Appellant was not prejudiced by counsel's decision as he has failed to show that there is a reasonable probability that the outcome of the case would have been different. Based upon the foregoing, we find that Appellant is not entitled relief due to the service of Mr. McDonald on the jury. Accordingly, this assignment of error is denied.

■ Prior to trial Appellant filed a Motion to Quash the jury panel asserting then as he does now on appeal that he was denied a jury representative of a fair cross-section of the community because 38 O.S. 1981, § 28(A), allows jurors seventy years of age or above to opt out of jury service. In *Moore v. State,* 736 P.2d 161, 165 (Okl. Cr.1987), *cert. denied,* 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987), we stated that *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), held that a defendant must establish a prima facie case in order to show a violation of the requirement that criminal defendants are entitled to juries drawn from a fair-cross section of the community. Appellant has failed to make such a prima facie showing in the instant case, as he has not shown that this exemption from jury service excludes a sufficiently numerous and distinct group, that representation of this group in venires is not fair and reasonable in relation to the number of such people in the community, and that this underrepresentation is due to the systematic exclusion of the group in the jury selection process. *Sellers v. State,* 809 P.2d 676, 682 (Okl.Cr. 1991); *Fox v. State,* 779 P.2d 562, 566 (Okl.Cr.1989). Accordingly, this assignment of error is denied.

■ Appellant also alleges that the trial court erred in not allowing individual voir dire of each juror, out of the hearing of the others, as to their views on capital punishment. In *Foster v. State,* 714 P.2d 1031, 1037 (Okl.Cr.1986), *cert. denied,* 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986), we stated:

> [a]lthough such a practice may be allowed by a trial judge, it is an extraordinary measure ... Unless the danger of prejudicing the jurors by exposure to

damaging information is a grave problem or some special purpose would be served, it is unlikely that individual voir dire would be justified. We find no abuse of discretion in not allowing the procedure.

Nor do we find any abuse of discretion in this case. The record reflects that both the State and the defense conducted an extensive voir dire examination. It does not appear that Appellant was prejudiced by not questioning the venire individually. *Sellers*, 809 P.2d at 682; *Fox*, 779 P.2d at 568; *Vowell v. State*, 728 P.2d 854, 857 (Okl.Cr.1986). Accordingly, this assignment of error is denied.

■ Appellant also alleges that the prosecutor's use of peremptory challenges to remove all potential jurors with any reservations about the death penalty produced a jury "uncommonly willing to condemn a man to die" in violation of the rule *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He also urges extension of the rule of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that the State cannot use a peremptory challenge to remove a prospective juror solely because of race, to require that this Court prohibit the State from exercising a peremptory challenge to excuse a juror from whom the court received equivocal responses on voir dire.

In *Witherspoon* the Supreme Court held that the exclusion of those potential jurors who express "conscientious scruples" against the death penalty violates a defendant's right to a fair and impartial jury. A standard was established that a venireperson could be excused from jury service on a capital case only if he or she made "unmistakably clear" his or her automatic refusal to impose a death sentence or an inability to impartially judge a defendant's guilt. In *Walker v. State*, 723 P.2d 273, 281 (Okl.Cr. 1986), this Court recognized that the Supreme Court had superseded the *Witherspoon* standard into a single test of "whether the juror's view would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v.*

*Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This single test not only eliminated the requirement that a juror would vote automatically against the death penalty before he or she may be excused, but also removed the requirement that such a view must be proved with "unmistakable clarity." *Id.*, 469 U.S. at 424, 105 S.Ct. at 852.

Applying this rule to the instant case, we find that the two prospective jurors[3] in question were not improperly removed from the panel. Both stated that they believed in the death penalty but wavered throughout voir dire on their ability to actually impose such a sentence. We find that their responses established the fact that their views about capital punishment would have prevented or substantially impaired their duties as jurors in accordance with the instructions and their oath. *See Battenfield v. State*, 816 P.2d 555, 558 (Okl.Cr.1991); *Banks v. State*, 701 P.2d 418, 423 (Okl.Cr.1985) *cert. denied*, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).

■ In *Batson* the Supreme Court determined that the Equal Protection Clause prohibits "exclusion of potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89, 106 S.Ct. at 1719. This rule does not alter existing principles which entitle a prosecutor "to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried." *Id.* No authority supports the proposition that equivocal jurors create a suspect class which invokes the stringent requirements of the Equal Protection Clause, and which would permit extension of the limited *Batson* rule. To the contrary, peremptory challenges need not be supported by any specific reasoning, unless the defendant asserts purposeful discrimination under *Batson*. 22 O.S.1981, § 654. We have previously held that both the

3. Venirepersons Stark and Paine.

State and the defense may excuse prospective jurors who respond equivocally to questions about the death penalty. *White v. State*, 674 P.2d 31 (Okl.Cr.1983). We are not persuaded to change our view.

No violation of equal protection principles arose in the present case. We have found no evidence in the record to suggest that jury selection involved purposeful discrimination or yielded a jury with an uncommon willingness to impose the death penalty. Accordingly, this assignment of error is denied.

## II. GUILT–INNOCENCE ISSUES

In his second assignment of error, Appellant contends that the evidence presented at trial was insufficient to support the verdicts of guilt. He argues that the circumstantial nature of the evidence of both the murder and the robbery, at best, raised only suspicion and speculation of guilt.

Circumstantial evidence and the reasonable inferences drawn therefrom have the same probative effect as direct testimony. When the evidence against the defendant is wholly circumstantial, as in this case, considering the evidence and inferences therefrom in the light most favorable to the State, it must be inconsistent with any reasonable hypothesis other than the defendant's guilt. *Greer v. State*, 763 P.2d 106, 107 (Okl.Cr.1988); *Smith v. State*, 695 P.2d 1360, 1362 (Okl.Cr.1985). The State is not required to exclude every conceivable hypothesis or negate any possibility other than guilt. *D.R.R. v. State*, 734 P.2d 310, 311 (Okl.Cr.1987).

When an appellant contends that he was convicted upon insufficient evidence, this Court must consider and examine the entire record. *Lee v. State*, 661 P.2d 1345, 1354 (Okl.Cr.1983). While each co-defendant is entitled to have his case decided on the basis of the evidence against him, this does not require this Court to review the evidence in a vacuum. Where two or more defendants are charged with acting in concert, evidence against each is available against the others. *Cooper v. State*, 584 P.2d 234, 237 (Okl.Cr.1978).

The evidence presented by the State in the instant case showed that the decedent was a jewelry dealer who lived alone in an apartment at the May Ridge Apartment complex in Oklahoma City. The decedent kept large amounts of jewelry, both new and older tarnished pieces, in his apartment. The decedent was also known to wear jewelry, particularly rings on every finger. In his apartment the decedent kept large cardboard buckets of change, specifically quarters. He was a regular customer at the Celebrity Club, coming in every night at approximately 12:30 and remaining until the 2:00 a.m. closing. The decedent was last seen leaving the club on Saturday, October 12 at 2:00 a.m.

On October 16, 1985, the decedent was found murdered. He had been beaten, strangled and stabbed five (5) times. Testimony from medical witnesses indicated that he had been dead for approximately two to three days. A newspaper, dated October 12, 1985, was found opened in his apartment. Rolled, unopened newspapers, dated October 13, 14, and 15, 1985, were found outside the apartment. No buckets of change were found in the apartment nor was any jewelry found on the decedent. A pair of slacks with the pockets pulled out was found draped over a door.

Appellant was incarcerated at the Enid Community Treatment Center during September and October 1985. He regularly received leave passes from the Center, including a weekend pass for October 11 through 13, 1985, when he checked out to Oklahoma City. While in Oklahoma City Appellant would stay at the residence of his girlfriend Marilyn Tyson. After one of Appellant's visits in late September or early October, Ms. Tyson discovered that some of her jewelry was missing. She questioned Appellant about the jewelry but he denied any knowledge. He stated that he would try to find out what happened to the missing pieces. When Ms. Tyson subsequently informed Appellant that she would turn the information over to her insurance company and would make known to the police her suspicions of him, Appellant be-

came upset and asked for more time to find out what happened to the jewelry. At a later date, Appellant told Ms. Tyson that he found out that the missing jewelry had been pawned to a jeweler and that the jeweler had been killed.

During the early part of October 1985, Appellant phoned Tracy Greggs and asked him to take him to meet the decedent to talk over some business. Greggs picked Appellant up at Ms. Tyson's home and drove him to the decedent's apartment. Appellant told Greggs that he had some rings which belonged to Ms. Tyson that he wanted to sell to Sarfaty. Appellant stated that he needed some money and had planned to rob Sarfaty and steal some of his jewelry, but as Sarfaty knew him he would also have to kill him. Appellant attempted to elicit Greggs' aid, but Greggs refused to participate. The decedent was found murdered a few days after this conversation.

On Saturday afternoon, October 12, 1985, Appellant and co-defendant Woodruff were together in a store in Quail Springs Mall. The two men were carrying cups of beer and appeared to be intoxicated. When they spilled the beer and vomited in the store, security was called to remove them. Woodruff initially refused to leave, announcing that he wanted to purchase a television. He told the clerk that they did not need any credit, that they had money. He and Appellant then emptied their pockets of quarters. The store clerk also testified that she saw what appeared to be a blood stain on Woodruff's pant leg. She said that he showed her a small cut on his hand.

Eventually, the men cooperated with the security personnel and were removed from the store. The quarters, estimated to be between $15.00 and $30.00 worth, but not counted, were scooped up in Appellant's baseball cap. Appellant and Woodruff were retained in a holding cell until they could be turned over to the Oklahoma City Police Department. A lock blade knife was removed from one of them.

Under a charge of disorderly conduct and public intoxication, the men were trans-ferred to the Detox Center. All of their personal belongings were sent with them. Procedures for booking a person into the Detox Center were more relaxed than those used in the county jail. Although not directly removed from him, a knife and two pens were listed as property checked by Romano. Both men refused to check any money or jewelry.

Denise Howe, Woodruff's girlfriend, subsequently picked up Appellant and Woodruff at the Center. Under their direction, she drove them back to Quail Springs Mall to retrieve Woodruff's car. She observed numerous small "diamond" papers (papers used to wrap diamonds and other small stones) surrounding the car. Ms. Howe testified that the following day she saw Woodruff with some gold jewelry she had not seen previously. She described the jewelry, a necklace and five or six rings, as looking old and tarnished. She said that Woodruff did not have the money to purchase the jewelry. Woodruff subsequently mailed the jewelry to a friend in California.

On October 16, 1985, at the residence shared with Ms. Howe, Woodruff received a phone call from the Enid Community Treatment Center. He and Ms. Howe subsequently drove out to the May Ridge Apartments. The sight of numerous police cars made Appellant nervous and fidgety and the two turned around and drove home.

Denise Howe further testified to receiving a phone call from Woodruff, after he had been taken into custody, to "clear out the house". In response to such request she removed pieces of rope, a watch and a pair of gloves. These items were later turned over to the police. A portion of the rope was tied in a fashion known as a garotte. The medical examiner testified that the width of the rope was consistent with the ligature marks found on the decedent.

This Court has held repeatedly that the jury is the exclusive judge of the weight of the evidence and the credibility of the witnesses testimony. *Hollan v. State*, 676 P.2d 861, 864 (Okl.Cr.1984); *Isom v. State*, 646 P.2d 1288, 1292 (Okl.Cr.1982). Al-

though there may be conflict in the testimony, if there is competent evidence to support the jury's finding, this Court will not disturb the verdict on appeal. *Enoch v. State*, 495 P.2d 411, 412 (Okl.Cr.1972). A reviewing court must accept all reasons, inferences and credibility choices that tend to support the verdict. *See Washington v. State*, 729 P.2d 509, 510 (Okl.Cr.1986).

Here the jury found sufficient evidence of guilt although Appellant thoroughly cross-examined the State's witnesses, successfully drawing attention to certain inconsistencies; placed before the jury names of several other persons who could have been responsible for the decedent's murder; and presented a witness who stated that he saw the decedent Sunday morning, the day after the State theorized the decedent was killed. In our review of the evidence, we find that sufficient evidence of guilt was presented to support the jury's findings and that such evidence satisfies the "reasonable hypothesis" test, demonstrating more than a suspicion of guilt. Therefore, we refuse to interfere with the jury's verdicts of guilt and this assignment of error is denied.

■ In his third assignment of error Appellant contends that he was denied a fair trial by prosecutorial misconduct. Appellant has specified approximately fourteen (14) instances during first stage closing argument arguing that the prosecutor deliberately misrepresented the evidence, vouched for the credibility of prosecution witnesses, denigrated defense witnesses, elicited sympathy for the victim and aligned himself with the jury. Ten (10) of these remarks were met with objections by the defense. Two (2) of these objections were sustained while the rest were overruled. In three (3) instances the jury was admonished to rely on its own memory of the evidence. We have carefully reviewed each of the allegations and find that the complained of remarks did not affect the outcome of this trial and that they neither separately nor cumulatively warrant modification or reversal.

It is well established that prosecutors are entitled to fully discuss the evidence from their standpoint, drawing all logical inferences and deductions arising from that evidence. *Holt v. State*, 628 P.2d 1170, 1171 (Okl.Cr.1981); *Glidewell v. State*, 626 P.2d 1351, 1353 (Okl.Cr.1981). We recognize, as did the United States Supreme Court in *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1, 9 (1985), that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be prejudicial to the accused." However, "... a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.*, 470 U.S. at 11, 105 S.Ct. at 1044, 84 L.Ed.2d at 11. This Court has held that in order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. *Collins v. State*, 758 P.2d 340, 341 (Okl.Cr.1988); *Wimberli v. State*, 536 P.2d 945, 952 (Okl. Cr.1975). From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. *Aiuppa v. United States*, 393 F.2d 597 (10th Cir.1968).

While some of the remarks, taken singly, exceeded the bounds of fair argument, the prosecutor's comments, when read in context, did not deprive Appellant of a fair trial. The record reveals no showing of a bad faith attempt to prejudice the jury nor an intentional emphasis upon collateral matters. Many of the complained of remarks came during the second portion of the closing argument, in reply to Appellant's closing argument. As we are not persuaded that the challenged remarks seriously affected the fairness of the trial, this assignment of error is denied.

■ In his fourth assignment of error Appellant asserts that the trial court infringed upon his constitutional rights to confront the witnesses against him and to present witnesses in his defense by preventing him from eliciting relevant evi-

dence indicating the involvement of others in the crimes charged.

During the course of the trial it became evident that the theory of defense was that of innocence and that someone other than the Appellant was responsible for the murder. Appellant's attempts to introduce evidence of the involvement of T.R. Ballard, Kathy Ford and Susan Babbit were frequently met with objections by the State; objections which the trial court sustained. Questions concerning the relevancy of particular evidence are within the discretion of the trial court. *Fitchen v. State*, 738 P.2d 177, 180 (Okl.Cr.1987). A determination that the evidence should be excluded as irrelevant should be affirmed unless there is a clear showing of abuse accompanied by prejudice. *Klinekole v. State*, 705 P.2d 179, 184 (Okl.Cr.1985).

In *Quinn v. State*, 55 Okl.Cr. 116, 25 P.2d 711 (1933), this Court held that evidence offered to show that some other person committed the crime charged must connect such other person with the fact; that is some overt act on the part of another towards the commission of the crime itself. There must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused. *See also Case v. State*, 555 P.2d 619, 623 (Okl.Cr. 1976). We addressed this issue again in *Tahdooahnippah v. State*, 610 P.2d 808, 810 (Okl.Cr.1980), and stated that it was not enough to show a possible motive on the part of another; the evidence must show an overt act by the third person toward the commission of a crime.

Appellant attempted to interject evidence that the decedent was involved with prostitutes, one of which was Susan Babbitt. Babbitt's name was brought up during the cross-examination of Detective Sealy. He testified that a Susan Babbitt was located but the police were unable to connect her with the Appellant, other than as an acquaintance from the Celebrity Club. Sealy stated that his investigation revealed that she was not the decedent's girlfriend and that no connection could be drawn between Ms. Babbitt and Kathy Ford.

Much of the evidence Appellant wanted to introduce about Kathy Ford came in either over the State's objection or with no objection from the State. Detective Sealy testified on cross-examination that the name Kathy Ford had come up in the investigation into the murder; however, they were not able to verify any actual person known to be Kathy Ford. An offer of proof was made by Appellant that, if permitted, Detective Sealy would testify that the name Kathy Ford came up several times as having possibly set the decedent up and robbed him.

During his case in chief, Appellant established that the decedent had last been seen by a neighbor arguing with a blonde headed woman. Evidence was also introduced to show that a knife had been sold to a person who gave her name as Kathy Ford. As with Susan Babbitt, none of the evidence presented or included in the offers of proof connected Ford with the commission of the murder. Appellant was also able to place before the jury substantial evidence of T.R. Ballard. However, evidence that Ballard knew the decedent from frequenting the same pool hall, that Ballard was destitute before the decedent's death, but seen with cash and jewelry after the murder, shows no overt act by him in the commission of the murder.

An offer of proof was made that Ballard's name was mentioned frequently in police reports. Defense counsel stated that, if permitted, Tom Farris would testify that Ballard and the decedent had business dealings and that the decedent had some problems with Ballard. When the court inquired into what the problems were and whether threats had been made defense counsel did not specifically respond to the court's inquiry but stated that the evidence was offered to show motive and opportunity. It was also stated that a witness testified as to Ballard's having slapped the decedent at some point in time. The court sustained the State's objection and informed the defense that the evidence could come in during the testimony of the witness who made the statement. No such testimony was ever offered. Without that

testimony or further evidence showing some act by Ballard in furtherance of the murder, we find the trial court properly ruled that further evidence was not relevant.

■ Appellant contends in his fifth assignment of error that the trial court erred in admitting prejudicial hearsay testimony from prosecution witness Jerry Jones. Mr. Jones testified to a conversation he had with several men, including Appellant, at a pool hall in Oklahoma City on October 12, 1985. Appellant specifically objects to Jones' testimony that it was common knowledge around the pool hall which he and Appellant frequented that the decedent was murdered on a Saturday and that the body had been discovered on a Monday or Tuesday. Appellant's objection was overruled and Jones was permitted to testify further that the above information was common knowledge because the owner of the pool hall had an acquaintance who was a medical examiner.

Appellant argues that Jones' third hand information was clearly hearsay for which no exception exists and was not admissible for any purpose. We disagree. In *Williams v. State*, 542 P.2d 554 (Okl.Cr. 1975), *vacated on other grounds, Williams v. Oklahoma*, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976) we stated:

... The clearest case of hearsay is where a witness testifies to the declaration of another for the purpose of proving the facts asserted by the declarant. The hearsay rule, however, does not operate, even apart from its exceptions, to render inadmissible every statement repeated by a witness as made by another person. It does not exclude evidence offered to prove the fact that a statement was made or a conversation was had, rather than the truth of what was said. Where the mere fact that a statement was made or a conversation was had is independently relevant, regardless of its truth or falsity, such evidence is admissible as a verbal act.... (Footnotes omitted)

542 P.2d at 574.

*See also Nunley v. State*, 660 P.2d 1052, 1055 (Okl.Cr.1983); *Garcia v. State*, 639 P.2d 88, 89 (Okl.Cr.1981); *Godwin v. State*, 625 P.2d 1262, 1265 (Okl.Cr.1981).

The information to which Jones testified was knowledge which he acquired as a result of a general conversation with Appellant and others at the pool hall about the death of Roger Sarfaty. The testimony was not offered to prove the truth of the matter asserted, that the decedent had in fact been killed on Saturday and that the body was not found until Tuesday. Rather, it was offered to show that those in the pool hall, including Appellant and Jones, had talked about Sarfaty's death; as foundation for Appellant's statement to Jones; and as the basis for Jones' observation of Appellant's demeanor. Therefore, as the testimony was not hearsay, Appellant's contention is denied.

■ In his sixth assignment of error Appellant complains that two pieces of rope retrieved from the home shared by Woodruff and Denise Howe were improperly admitted into evidence. He argues that the State failed to show the relevance of the rope by connecting it to the crime. The general rule regarding demonstrative evidence is that it is admissible if it is relevant and the probative value of the evidence outweighs the prejudicial effect. *Sheker v. State*, 644 P.2d 560, 562 (Okl.Cr.1982), 12 O.S.1981, §§ 2402, 2403. Admission of a weapon in a murder case is proper "if significant evidence exists from which a reasonable inference can be drawn that the weapon was used by the defendant to commit the crime." *Pannell v. State*, 640 P.2d 568, 571 (Okl.Cr.1982). On appeal, the burden of establishing prejudice from the admission of incompetent evidence is upon the defendant. *Moser v. State*, 509 P.2d 184, 185 (Okl.Cr.1973).

■ In this case, the rope was received by the police from Denise Howe. She took the rope out of the closet shared with Woodruff at his request to "clear out the house." One of the pieces of rope was tied in a garrotte. Testimony established that a rope tied in this manner could be used as a strangulation device. The rope was examined by the medical examiner and found to

be consistent with the size and weight of rope which left the ligature marks on the decedent's body. The pattern of bruising on the decedent's neck was particularly unique and probative of the manner in which the rope was used. The way in which the rope was tied was compatible with the type of bruising which resulted. This Court has long held that in order to be relevant, the evidence need not conclusively, even directly, establish the defendant's guilt. Any legal evidence from which the jury may adduce the guilt or innocence of the defendant is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue. *Ashlock v. State*, 669 P.2d 308, 310 (Okl.Cr.1983); *Fahay v. State*, 288 P.2d 757, 760 (Okl.Cr. 1955). See also, 12 O.S.1981, § 2401.

The rope was relevant to the case in allowing the jury to visualize one of the weapons used in the attack. We find that the State sufficiently connected the rope to the crime and to the Appellant to permit its proper introduction into evidence. Accordingly, this assignment of error is denied.

■■■ Further, Appellant finds error in the opinion testimony of Detective Mullinex that the rope was tied in a garrotte and in the demonstration of how it could be used as a weapon. The testimony was properly admitted under 12 O.S.1981, § 2702 as that of an expert. Under section 2702 expert opinion testimony is admissible if it is based upon specialized knowledge unavailable to the layman and if it will assist the trier of fact in making a decision.

Detective Mullinex was not originally assigned to Appellant's case but was the chief investigator by August 1986, when Denise Howe turned over the rope to the police. He subsequently submitted it to the forensics lab for analysis. His opinion that the rope was tied in a manner known as a garrotte and that a garrotte could be used as a strangulation device was based upon his personal knowledge. As a police officer he was certainly more familiar with the uses of a rope as a weapon than the general public. See *Farris v. State*, 670 P.2d 995, 997 (Okl.Cr.1983), *Harvell v. State*, 395 P.2d 331 (Okl.Cr.1964).

Further, the rope was a critical piece of evidence. The manner in which it was tied required an explanation. The opinion of Detective Mullinex was highly probative of the determination of whether or not the rope was used as a murder weapon. As such we find that the testimony met the requirements of Section 2702 and there was no error in admitting this testimony. *See Green v. State*, 713 P.2d 1032, 1039 (Okl.Cr.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986).

■■■ Detective Mullinex also demonstrated, over the objection of defense counsel, the use of the garrotte. It was placed around the neck of an Assistant District Attorney with the gap in the back where the two ropes were pulled together pointed out to the jury. Appellant argues it was error for the trial court to permit the demonstration.

The demonstration in the present case does not compare to that in two cases cited by the Appellant *Ford v. State*, 719 P.2d 457 (Okl.Cr.1986), and *Brewer v. State*, 650 P.2d 54 (Okl.Cr.1982). In *Ford* we condemned the prosecutor's conduct of demanding that the defendant pick up the gun used in the homicide and show the jury how it was used. While in *Brewer* we found the defendant was prejudiced during the prosecutor's cross-examination of the defendant's expert witness on insanity by stabbing a picture of the decedent with the knife allegedly used to commit the murder. In both cases the prosecutor's conduct was found to be prejudicial theatrics which went entirely outside the record and had no probative value.

The demonstration here is similar to that discussed in two cases cited by the State. In *State v. Sutherland*, 24 Wash.App. 719, 604 P.2d 957 (1979), *rev'd on other grounds*, 94 Wash.2d 527, 617 P.2d 1010 (1980), and *State v. Rich*, 395 A.2d 1123, 1131 (Me.1978), demonstrations of weapons for illustrative purposes were upheld. Although the defendant was not placed in actual possession of the weapon used in either case, the demonstrations were found relevant and helpful to the jury. In *Sutherland* the evidence established that the

defendant had purchased a .38 caliber Smith and Wesson revolver, a weapon which could produce the precise physical characteristics found on the bullets removed from the decedent and examined by the ballistics expert. The evidence also showed an absence of any record of the transfer of that weapon until the time of the decedent's death.

In *Rich* the evidence showed that the murder weapon was a pengun. The defendant owned and carried a pengun which he threw into the water off the wharf shortly after the murder took place. The exhibition of a pengun to the jury, similar to the one owned by the defendant and of a type unknown to the general public, was upheld as the unique physical makeup aided in explaining to the jury its construction and use.

In the present case, the rope was removed by the co-defendant's girlfriend, at his request, from a closet shared by the two. The physical characteristics of the rope were consistent with the marks left on the decedent's body. Contrary to Appellant's assertion, the general public is not familiar with the use of a garrotte or the process of strangulation. Because of the specific configuration in which the rope was tied, the demonstration was highly informative.

Further, we do not find the demonstration "grandstanding" as Appellant suggests, but an illustration of a use of the evidence which was helpful to the jury in deciding the issue before them. The brief demonstration was not so prejudicial as to outweigh the probative value of helping the jury understand how the rope could have been used. Appellant was able to thoroughly cross-examine Detective Mullinex as to his opinion and demonstration. Therefore, we find that the trial court did not abuse its discretion in permitting the demonstration. *See Palmer v. State,* 719 P.2d 1285, 1288 (Okl.Cr.1986). This assignment of error is denied.

### IV. ISSUES RELATING TO PUNISHMENT

■ Title 21 O.S.1981, § 701.11, provides in part that if a jury returns a verdict of death, "it shall designate in writing ... the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt." Appellant challenges the constitutionality of this section arguing that it mandates a general verdict with special findings of fact; a type of verdict prohibited by Art. 7, § 15 of the Oklahoma Constitution.

It is a well established rule of law that a legislative act is presumed to be constitutional. *Hilliary v. State,* 630 P.2d 791, 794 (Okl.Cr.1981); *White v. Coleman,* 475 P.2d 404, 405 (Okl.Cr.1970). Whenever reasonably possible statutes should be construed so as to uphold their constitutionality. *State v. Madden,* 562 P.2d 1177, 1179 (Okl.Cr.1977). The party attacking the constitutionality of the statute has the burden of proof. *Williamson v. State,* 463 P.2d 1004 (Okl.Cr.1969). When reviewing the constitutionality of a legislative act, we do not look to the Constitution to determine whether the Legislature is authorized to do an act, but rather to see whether the act is prohibited. *Draper v. State,* 621 P.2d 1142, 1146 (Okl.1980).

■ Title 21 O.S.1981, § 701.11 addresses the procedures to be followed during the sentencing stage of a capital murder trial. Appellant specifically challenges the constitutionality of the following portion of Section 701.11:

> ... the jury, if its verdict be a unanimous recommendation of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstance or circumstances which it unanimously found beyond a reasonable doubt.
>
> ....

Our state constitution does not address the role of the jury in sentencing a defendant convicted of a criminal offense. The constitution provides that "the right to trial by jury shall be and remain inviolate ..." Okl. Const. art. 2, § 19. And that "in all jury trials, the jury shall return a general verdict, and no law shall require a court to direct the jury to make findings of particu-

lar questions of fact, but the court may, in its discretion, direct such specific findings. *Id.*, art. 7, § 15. This language is unique to the Oklahoma Constitution. See *Smith v. Gizzi,* 564 P.2d 1009, 1013 (Okl.1977). Further, the provisions of Article 7, § 15, apply to "all jury trials" in the state of Oklahoma. Therefore, we must consider the application of this constitutional language by the Oklahoma Supreme Court.

The same type of legal argument was presented to the Oklahoma Supreme Court regarding the application of Oklahoma's Comparative Negligence Statutes as Appellant has presented here regarding the capital sentencing process. *See Smith v. Gizzi, Id.; Vaught v. Holland,* 554 P.2d 1174 (Okl.1976). In discussing the definitions of "general" and "special" verdicts the court stated:

> The jury under a special verdict is limited to the findings of specified facts and should not know the legal effect of its answers. Defendant is correct that in those states using a special verdict the court may create error by informing the jury of the effect of its answers. However, in Oklahoma, because our verdict must be general, this rule of law has no application. The jury not only must know the legal effect of its findings, but must determine the ultimate result, limited only by the special findings as to each parties degree of negligence. Such special findings are constitutionally and statutorily permitted. Under a general verdict, a jury must know the effect of its answers or it is not a general verdict. Under Oklahoma law the instruction was not error.
>
> A trial court in Oklahoma however, must be cautious in presenting a verdict form to the jury to insure that it is a general verdict. If the verdict is not wholly determinative of the right of recovery the verdict would be special. As long as a jury finds in favor of either plaintiff or defendant, special findings of fact will not deprive the verdict of its generality. 564 P.2d at 1013.

This interpretation is consistent with the legislative definition of the form of verdict in criminal cases set forth at 22 O.S.1981, § 914, which states "[a] general verdict upon a plea of not guilty, is either 'guilty', or 'not guilty', which imports a conviction or acquittal of the offense charged". The constitutional right to jury trials in Oklahoma relates only to the determination of guilt. Art. 2, § 19. Therefore, the provisions of Article 7, § 15, must be read and applied in that context. This interpretation is consistent with the provisions of Section 914. *Id.*

The law and procedure to be followed in sentencing an individual convicted of a criminal offense is found in the statutory provisions of Title 21 and 22, specifically in 22 O.S.1981, § 926 and 21 O.S.1981, § 701.-10. Section 926 provides that in all cases of a verdict of conviction for any offense against the State of Oklahoma, the jury may, and shall upon the request of the defendant assess punishment. While Section 701.10, limited to convictions for first degree murder, provides for a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment. The challenged portion of Section 701.11 is merely further direction to the jury as to the procedure to be used in determining punishment. Designating the statutory aggravating circumstances found by the jury to support the death sentence does not constitute a verdict with special findings as the result of the jury's second stage deliberations is not a true "verdict". The "verdict" is a determination of the guilt or innocence of the accused, not the determination of the punishment to be imposed. See 22 O.S.1981, §§ 16 and 914.

We have thoroughly examined the Constitution and find no restraints prohibiting the Legislature from enacting statutory provisions governing the sentencing of defendants convicted of first degree murder. Based on the above analysis, we find, as did the Oklahoma Supreme Court in *Smith,* that the verdicts rendered in accordance with our capital sentencing procedure are general verdicts which comply with the requirements of Art. 7, § 15.

During the second stage of trial, the State sought to prove four aggravating circumstances; 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was especially heinous, atrocious or cruel; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 4) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Appellant contends that his death sentence should be modified to life imprisonment because at the time of Roger Sarfaty's murder, the aggravating circumstance "especially heinous, atrocious or cruel" was unconstitutionally vague. Roger Sarfaty was found murdered on October 16, 1985. In its 1988 decision of *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court held that the aggravating circumstance of "especially heinous, atrocious or cruel" was constitutionally invalid as applied in that case because 1) the jury was not guided by language sufficient to bridle its discretion and 2) this Court did not cure any unbridled jury discretion by narrowing the application of the aggravating circumstance. 486 U.S. at 363–65, 108 S.Ct. at 1859.

This Court narrowed the interpretation of that particular aggravating circumstance in *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988), to apply to instances of death preceded by torture or serious physical abuse. The judicially restricted interpretation was applied to a murder committed in 1985. In *Foster v. State*, 779 P.2d 591 (Okl.Cr.1989), we recognized that the problems underlying the reversal of Cartwright's death sentence stems from the fact that the jury was given incomplete instructions. The instructions did not address the limiting factors previously adopted and mandated by this Court for use with the aggravating circumstance "especially heinous and cruel.

The jury instruction given in the present case, both paragraphs of Oklahoma Uniform Jury Instructions—Criminal No. 436, embodies the limitations which the sentencer must consider in the application and finding of this particular aggravating circumstance. We have reexamined these principles on several occasions and have since consistently applied the narrow construction discussed above. *See Boltz v. State*, 806 P.2d 1117 (Okl.Cr.1991); *Moore v. State*, 788 P.2d 387, 401–402 (Okl.Cr. 1990); *Fox*, 779 P.2d at 576; *Fowler v. State*, 779 P.2d 580, 588 (Okl.Cr.1989); *Nguyen v. State*, 769 P.2d 167, 174 (Okl.Cr. 1988); *Rojem v. State*, 753 P.2d 359 (Okl. Cr.1988); *Hale v. State*, 750 P.2d 130, 142 (Okl.Cr.1988); *Mann v. State*, 749 P.2d 1151, 1160 (Okl.Cr.1988). Accordingly, we find that this particular aggravating circumstance was applied in a constitutional manner in the present case.

Appellant contends next that the State failed to prove beyond a reasonable doubt the murder was especially heinous, atrocious or cruel. Appellant argues that this particular aggravating circumstance must fall pursuant to our decision in *Brown v. State*, 753 P.2d 908 (Okl.Cr.1988), as the medical examiner was unable to state which of two potentially fatal wounds, the strangulation or stabbing, was inflicted first.

The evidence supporting a finding that the murder was especially heinous, atrocious or cruel requires proof that the death was preceded by torture or serious physical abuse. *Id.* Doctor Chai Choi, a forensic pathologist with the Office of the Chief Medical Examiner, testified that bruises and abrasions to the decedent's knees and elbows suggested that a struggle had taken place prior to the murder. Ligature marks on the decedent's wrists and ankles indicated that he had been forcefully restrained with his wrists and ankles bound. Injuries to the decedent's head showed that he had been struck approximately five times with a long blunt object, producing wounds consistent with those created by a baseball bat. She further testified that the cause of death was strangulation, a death which occurred only after three to five minutes of slow suffocation. Dr. Choi also

testified that the decedent suffered five (5) stab wounds, two (2) of which were potentially fatal.

In *Brown*, we found insufficient evidence to support a finding that the murder was heinous, atrocious, or cruel as the medical examiner could not state which of the seven gunshot wounds was the fatal wound. This is clearly distinguishable from the present case wherein Dr. Choi testified that the injuries received by the decedent indicated that the strangulation preceded the stabbing. Although some of the bruising and lacerations to the arms and head occurred after the decedent's death, she unequivocally stated that the cause of death was suffocation caused by the strangulation.

When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. In making this determination, this Court should view the evidence in the light most favorable to the State. *Brogie v. State*, 695 P.2d 538, 542 (Okl.Cr. 1985), *modified on other grounds*, 760 P.2d 1316 (Okl.Cr.1988).

When the evidence is considered in this light, we find it was clearly sufficient. Evidence that the decedent struggled with his assailants, was beaten with a blunt instrument·several times and ultimately died of strangulation was sufficient to establish the requisite torture or serious physical abuse necessary to sustain the aggravating circumstance that the murder was heinous, atrocious or cruel. In making this determination, we have specifically excluded the stab wounds inflicted post-mortem. Accordingly, we find that Roger Sarfaty's murder was especially heinous, atrocious or cruel and that the jury's finding of this particular aggravating circumstance was based on substantial uncontradicted evidence.

■ In his next assignment of error, Appellant alleges that the evidence was insufficient to prove that he killed the decedent for the purpose of avoiding or preventing lawful arrest or prosecution. The existence of this aggravating circumstance is determined by looking at the killer's intent. *Williamson v. State*, 812 P.2d 384, 407 (Okl.Cr.1991); *Fox*, 779 P.2d at 576, *Fowler*, 779 P.2d at 588, *Stouffer v. State*, 738 P.2d 1349, 1361–1362 (Okl.Cr.1987), *Moore v. State*, 736 P.2d 161, 165 (Okl.Cr. 1987). In the absence of his own statements of intent, such evidence may be inferred from circumstantial evidence. *Rojem*, 753 P.2d at 368; *Banks*, 701 P.2d at 426.

■ Evidence presented by the State showed that Appellant knew Sarfaty, planned to rob him, and because Sarfaty knew him, Appellant would have to kill him to keep from being caught. We find this sufficient evidence from which a rational juror could have found beyond a reasonable doubt the existence of this aggravating circumstance.

■ In his thirteenth assignment of error Appellant contends that the aggravating circumstance "continuing threat" must be set aside and the death sentence vacated as the principles of double jeopardy and collateral estoppel bar the jury's finding of this aggravator. At the time of the present trial, Appellant and co-defendant Woodruff had been previously tried by jury and convicted of the murder of Lloyd Thompson. During the Thompson trial, the State presented evidence of the Sarfaty homicide in the second stage to support the aggravating circumstance that the defendants constituted a continuing threat to society. The jury in that trial rejected that aggravator. Appellant now argues that the State is precluded from using that same evidence in the instant case to determine whether Appellant constitutes a continuing threat to society.

In *Ashe v. Swenson*, 397 U.S. 436, 442, 90 S.Ct. 1189, 1193, 25 L.Ed.2d 469, 475 (1970), the Supreme Court stated that collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuits." The Court held that collateral es-

toppel was not only a requirement of due process, but was a part of the Fifth Amendment's guarantee against double jeopardy.

The Double Jeopardy prohibition constitutionally guaranteed by the Fifth Amendment to the United States Constitution and Article 2, § 21, of the Oklahoma Constitution applies only to an individual's right not to be placed twice in jeopardy for the same offense. While the doctrine of collateral estoppel, adopted by the Court in *Ashe*, is much broader and applies to the adjudication by a trier of fact that the accused was not the person who committed the acts comprising the charged offense or that the accused had not committed an essential element of a separate and distinct offense. The foundational question which must be answered in determining the applicability of collateral estoppel is whether there has been a prior adjudication by a trier of fact which in effect acquits the accused of the specific charged offense or an essential element of a separate and distinct offense. *See Ellis v. State,* 834 P.2d 985 (Okl.Cr. 1992); *White v. State,* 821 P.2d 378 (Okl. Cr.1991) (Lumpkin, J. concurring in results).

In *Buckaloo v. State,* 650 P.2d 885 (Okl. Cr.1982), the State sought to enhance the defendant's punishment for second degree burglary with three prior felony convictions. The jury declined to find the defendant guilty of the former convictions. Subsequently, the defendant was charged and tried for first degree robbery. At the robbery trial, the State again sought to enhance punishment with the same three felony convictions used in the prior trial. The defendant argued that the previous jury's refusal to find him guilty of the former convictions estopped the State from using the same three convictions for enhancement purposes in all subsequent prosecutions.

This Court disagreed with the defendant's argument stating that the determination of punishment in one case, using the facts of another case, is not a decision of ultimate fact in the cases used for enhancement. Quoting *Jordan v. State,* 327 P.2d

712 (Okl.Cr.1958), we said that providing enhanced punishment for second and subsequent offenses does not create or define a new or independent crime, but describes circumstances where one found guilty of a specific crime may be more severely penalized because of his previous conviction. 650 P.2d at 887. In *Johnson v. District Court of Oklahoma County,* 653 P.2d 215, 219 (Okl.Cr.1982) we stated:

> Furthermore, during the sentencing stage of a capital case, the court or jury may consider relevant evidence that might not otherwise be admissible at trial, i.e., evidence of other crimes, and prior convictions. There must be due process limitations on the introduction of this evidence during the sentencing stage. However, the consideration of this evidence does not constitute double jeopardy. The defendant is not being punished a second time for the same offense; instead, the evidence is used to establish the defendant's character and criminal propensities which may justify the imposition of the death penalty. 653 P.2d at 218–219.

Based upon the foregoing, we find that the use of evidence of the Sarfaty homicide to prove "continuing threat" was not prohibited under the doctrine of collateral estoppel. The jury's consideration of the evidence of Sarfaty's murder during the second stage of the Thompson trial was not a final decision on the ultimate issue of Appellant's guilt or innocence of Sarfaty's murder. As we stated in *Johnson,* "To find otherwise, would abrogate the legislative intent to hold a defendant responsible for his separate and distinct acts of criminal misconduct." 653 P.2d at 219. This assignment of error is therefore denied.

▇▇▇ In his fourteenth assignment of error Appellant challenges the application of the aggravating circumstance of "continuing threat" arguing that the circumstance is unconstitutionally vague as applied and that the instructions given to the jury failed to adequately channel the sentencer's discretion. Appellant has properly preserved this issue for appellate review as he

submitted two (2) proposed jury instructions to the court.[4]

However, we have previously analyzed and upheld this aggravating circumstance finding it specific, not vague, and readily understandable. *Boltz,* 806 P.2d at 1125; *Munson v. State,* 758 P.2d 324, 335 (Okl. Cr.1988); *Liles v. State,* 702 P.2d 1025, 1031 (Okl.Cr.1985); *VanWoundenberg v. State,* 720 P.2d 328, 336 (Okl.Cr.1986), *cert. denied,* 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986).

We are not now persuaded to alter that position. Accordingly, this assignment of error is denied.

■ In his fifteenth assignment of error Appellant contends that the trial court erred in admitting any evidence of his conviction for the Thompson murder as it was not a final conviction and was then pending on appeal. To prove the aggravating circumstance of "continuing threat" the State presented evidence of the Thompson murder, specifically testimony by Thompson's neighbor concerning her observations the day of the homicide, the autopsy report reflecting the pathological diagnoses of the victim and photographs and fingerprints showing that the defendant in that case was in fact the Appellant. The fact that Appellant's conviction for this murder was not final does not affect the admissibility of evidence of the offense. In *Johnson v. State,* 665 P.2d 815, 822 (Okl.Cr.1982), this Court held:

> Evidence of a defendant's criminal record, or prior unadjudicated acts of violent conduct is relevant to the determination of whether the defendant is likely to commit future acts of violence that would constitute a continuing threat to society.... It is not necessary there be a final conviction for an unrelated criminal offense to be admissible at the sentencing stage.

See also *VanWoundenberg v. State,* 720 P.2d at 337.

■ Our decision is not altered by the fact that Appellant's conviction for the Thompson homicide has been reversed and remanded for a new trial. See *Romano v. State,* 827 P.2d 1335 (Okl.Cr.1992). As the case was not reversed on the basis of insufficient evidence of guilt, the facts of the Thompson homicide remain relevant evidence which the jury in the instant case should consider in determining the appropriateness of the death sentence. Contrary to Appellant's argument, this decision is not violative of the dictates of *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), wherein the Supreme Court specifically declined to review the possible relevance of the conduct giving rise to the prior conviction which had been set aside as no evidence describing that conduct had been presented to the jury.

■ However, the same cannot be said of the judgment and sentence and docket sheet from the Thompson case. This evidence was admitted to show that a prior conviction had been obtained and that it was not final but on appeal. As that prior conviction has fallen, the judgment and sentence is no longer proper support for the "prior violent felony" aggravating circumstance. Therefore, this aggravator falls.

■ In his seventeenth assignment of error Appellant argues that he is entitled to a modification of his sentence should one aggravator fall because this Court's practice of reweighing aggravating circumstances versus mitigating evidence usurps the jury's function. Specifically, he argues that reweighing is unconstitutional because it deprives the defendant of the right to be sentenced by a jury of his peers and applied to this case would be a violation of the prohibition against *ex post facto* laws. This argument has previously been rejected in *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

In *Castro v. State,* 749 P.2d 1146, 1148 (Okl.Cr.1987) *cert. denied,* 485 U.S. 971,

---

**4.** Defendant's proposed Instruction No. 13 defined the term "society" and proposed Instruction No. 18 instructed the jury to look to the Appellant's background, psychological studies and demeanor at trial to see if there were indicators that would support the circumstance. (O.R. 272, 278)

108 S.Ct. 1248, 99 L.Ed.2d 446 (1988) we determined that the potential reevaluation of the defendant's sentence during direct appeal proceedings does not encroach upon his right to jury sentencing and permits this Court to affirm the death sentence even if one aggravating circumstance fails. Although the capital sentencing statutory scheme does provide for jury sentencing, it also provides for sentence review by the Court and for review by the state district court and this Court through post-conviction procedures. 21 O.S.Supp.1985, § 701.-13; 22 O.S.1981, § 1080 *et seq.* The *ex post facto* claim was also specifically rejected in *Castro*, as we stated that reweighing the aggravating circumstances against the mitigating evidence was procedural and does not criminalize innocent conduct nor increase the crime. 749 P.2d at 1150–1151. Accordingly, this assignment of error is denied.

█ Appellant further argues that sentence of death is unreliable because the jury's sense of responsibility was diminished by acts of the trial court and the prosecutor. Specifically, Appellant directs our attention to the trial court's direction to the jury during voir dire that their function was to recommend punishment, the fact that reflected in the judgment and sentence for the Thompson murder was Appellant's sentence of death, and a comment by the prosecutor during closing argument to "put the defendant on death row".

The jury has the prime responsibility for deciding whether the death penalty should be imposed. We must be cautious to avoid any actions or directions which would tend to reduce the jurors' sense of responsibility for their decision. In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court stated that the constitution prohibits imposition of a death penalty which rests on a "determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* 472 U.S. at 328–329, 105 S.Ct. at 2639. No such misconception exists on this record. During voir dire, the trial court asked each prospective juror in part: "If you find beyond a reasonable doubt that the Defendants are guilty of Murder in the first degree, your duty is to determine whether or not, considering the evidence, you should recommend death."

We find no error as this is a proper statement of the law. See 22 O.S.1981, § 961 *et seq.*, § 1001 *et seq.* Further, in light of the explicit instructions given during second stage, nothing in the court's conduct can be said to have diverted the jury from its "awesome responsibility." *Caldwell*, 472 U.S. at 330, 105 S.Ct. at 2640.

Learning that the defendant had previously received a death sentence for another murder could diminish the jury's sense of importance of its role and mitigate the consequences of their decision. However, when the jury is properly instructed as to its role and responsibility in making such a determination we cannot, on appellate review, conclude that the jury in any way shifted the responsibility for their decision or considered their decision any less significant than they would otherwise.

In the present case, the importance of the jury's role at sentencing is evident from the instructions. The jury was instructed that it had the responsibility for determining whether the death penalty should be imposed. They were informed of their role as factfinders, that the weight and value of testimony and evidence was for them to determine, that they should not surrender their own judgment to that of any witness or item of evidence, and of their duty to follow the law in reaching their conclusion. It was never conveyed or intimated in any way, by the court or the attorneys, that the jury could shift its responsibility in sentencing or that its role in any way had been minimized. The instructions given to the jury provided sufficient guidance as to how their judgment should be exercised. In this light, it is highly unlikely that the jury's sense of responsibility would have been diminished based upon knowledge of the prior imposition of the death sentence.

The "qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S. 992, 998, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983). Reviewing the sentencing determination in the present case under this heightened standard, but also with a presumption of correctness, we find no reason to question the jury's conclusion. While evidence of the imposition of the death penalty by another jury is not relevant in determining the appropriateness of the death sentence for the instant offense, the admission of this evidence did not so infect the sentencing determination with unfairness as to make the determination to impose the death penalty a denial of due process.

Further, the prosecutor's request of the jury to put the defendants on death row is not violative of the *Caldwell* rule. This brief remark was simply a way of asking the jury to impose the death penalty. We do not find that this comment in any way lead the jury to believe that the ultimate responsibility for the defendants' fate rested elsewhere. Accordingly, this assignment of error is denied.

■ Appellant offered evidence in mitigation of his completion of numerous bible study courses and the testimony of the jail's chaplain concerning his religious accomplishments. On re-direct examination, defense counsel asked Helen Pearce, Assistant Chaplain in the Oklahoma County Jail, if she felt that Appellant was involved in "jailhouse religion" or if she felt it was something more. The prosecutor's objection was sustained. Appellant now objects to that ruling, to the use of the term "jailhouse religion" in the prosecutor's closing argument, and to jury instructions which directed consideration of aggravating circumstances in mandatory terms but consideration of mitigating evidence in permissive terms.

Initially, we find that the trial court properly precluded Ms. Pearce from giving her personal opinion as to Appellant's religious commitment. Such testimony called for mere speculation on the part of the witness and was not helpful to a clear understanding of the issue. See 12 O.S.1981, § 2701. Further, we find no error in the prosecutor use of the term "jailhouse religion" during closing argument. The comments in the State's closing argument were reasonable inferences based upon the term as brought up during the testimony of Ms. Pearce. Moreover, the remark was not met with an objection by the defense during closing argument.

■ Further, the jury was not prevented from considering any relevant mitigating evidence. Instruction No. 9 informed the jury that "mitigating circumstances are those, which in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame." The jury was further told that the determination of what was mitigating evidence was for them to determine. Instruction No. 10 provided a list seventeen (17) specific items which the jury could consider as evidence to mitigate Appellant's punishment. The jury was instructed that whether the listed circumstances existed and whether they were mitigating evidence was their decision. The jury was also provided a list of the aggravating circumstances which the State sought to prove against the Appellant. Instruction No. 7 informed the jury that the defendant is presumed innocent of the charges made in the Bill of Particulars and it is the burden of the State to prove beyond a reasonable doubt the aggravating circumstances alleged. Additional instructions informed the jury that it could only recommend a death sentence upon a unanimous finding of the existence beyond a reasonable doubt of one or more aggravating circumstance or circumstances, and upon a unanimous finding that any such aggravating circumstance or circumstances outweighed the finding of mitigating circumstances. 21 O.S.Supp.1987, § 701.11.

We find that the instructions given in the present case do not direct the jury to disregard any mitigating evidence. Rather, the instructions provide the fullest possible latitude for the consideration of evidence in mitigation. The jury was not prohibited in

any way from considering any and all relevant mitigating evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). As the instructions given adequately apprised the jury of the method by which it should determine the sentence against the defendant, this assignment of error is denied.

■ Appellant further alleges in his eighteenth assignment of error that the trial court erred in failing to instruct the jury that it had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. Reviewing for fundamental error only as the Appellant failed to request such an instruction, we find no error warranting reversal or modification of sentence.

In *Walker v. State*, 723 P.2d 273, 284 (Okl.Cr.1986), the appellant claimed error in the refusal to give his requested instruction on "jury nullification". Defined as "the jury's exercise of its inherent 'power to bring in a verdict of [acquittal] in the teeth of both the law and facts' ", we found that most courts have uniformly held that a defendant is not entitled to such an instruction. *See also Williamson v. State*, 812 P.2d at 410. We find no error in the omission of this instruction.

■ Appellant contends in his nineteenth assignment of error that the trial court erred in instructing the jury not to allow sympathy, sentiment or prejudice to enter into its deliberations. This argument was rejected in *Fox v. State*, 779 P.2d at 574–575. We are not persuaded to deter from that position. *See also Williamson*, 812 P.2d at 408; *Moore v. State*, 788 P.2d 387, 401 (Okl.Cr.1990). Accordingly, this assignment of error is denied.

■ In his twenty-first assignment of error Appellant alleges that the trial court failed to properly instruct the jury concerning the burden of proof and the manner in which to weigh the aggravating circumstances and mitigating evidence. Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). *See also Walker v. State*, 723 P.2d at 284; *Brogie v. State*, 695 P.2d at 544. The instructions given to the jury properly advised them to weigh the aggravating circumstances against the mitigating evidence. Instructions No. 8 through 12 comprehensively informed the jury that a finding of the aggravating circumstances beyond a reasonable doubt is not by itself enough to assess the death penalty. Rather, the aggravating circumstances must clearly outweigh the mitigating, or death may not be imposed. Similar instructions have passed constitutional muster. *See Davis v. State*, 665 P.2d 1186, 1202 (Okl.Cr. 1983).

■ Further, the trial court properly denied Appellant's requested instruction which placed a "beyond a reasonable doubt" standard on the ultimate life or death determination. In *Johnson v. State*, 731 P.2d 993 (Okl.Cr.1987), we held that the burden of proof analysis is not strictly applicable to the weighing process. Quoting to *Daniels v. State*, 453 N.E.2d 160 (Ind. 1983), we stated that while the State must prove beyond a reasonable doubt the existence of at least one of the enumerated aggravating circumstances, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a fact which must be proved beyond a reasonable doubt. Instead, it is a balancing process. 731 P.2d at 1005.

■ In his twenty-fourth assignment of error, Appellant contends that Oklahoma's death penalty statutes are unconstitutional as they allow unbridled prosecutorial discretion in seeking the death penalty. Appellant argues that, aside from the statutory aggravating circumstances, statutes provide no guidelines for determining when prosecutors should seek the death penalty. Because of the lack of adequate guidelines, Appellant continues, the decision whether or not to seek the death penalty will, and does to a great degree, depend on the whim of the individual prosecutor. A similar argument was raised in *Crumley v. State*, 815 P.2d 676 (Okl.Cr.1991). We preface our remarks here, as we did in *Crumley*, with the notation that we do not take alle-

gations like these lightly, however, Appellant has provided nothing in support of his theory except unsubstantiated speculation.

The decision regarding which criminal charge to bring lies within the wide parameters of prosecutorial discretion. *Gray v. State*, 650 P.2d 880, 882 (Okl.Cr.1982). See also *Dangerfield v. State*, 742 P.2d 573 (Okl.Cr.1987). However, prosecutorial discretion is not unlimited. In *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), the Supreme Court stated;

> the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was [not] deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification.

Nor do we find such selectivity in itself to be a state constitutional violation. Limits on this discretion exist by virtue of the statutory schemes governing criminal law as well as those governing the practice of law. See *Ray v. State*, 510 P.2d 1395 (Okl. Cr.1973) (wherein this Court adopted the American Bar Association Standards for Criminal Justice). See also 5 O.S.1981, Ch. 1, App. 3, DR 7–103(A) and 5 O.S.Supp. 1988, Ch. 1, App. 3A, Rule 3.8. Rules of Professional Conduct (prohibiting a prosecutor from bringing charges unless supported by probable cause). Prosecutors are presumed by law to act in good faith when determining which crimes to prosecute and which punishments to seek. *United States v. Blitstein*, 626 F.2d 774 (10th Cir.1980); *United States v. Bennett*, 539 F.2d 45 (10th Cir.1976) *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

As the Tenth Circuit Court of Appeals stated in *Blitstein* "It is the obligation of a criminal defendant to demonstrate that the government's prosecution of him was based upon impermissible discriminatory grounds ..." *Id.* at 782. We find that in the present case, the Appellant has failed to make such a showing and that when the statutes and case law are considered together, sufficient guidelines exist to properly direct prosecutorial discretion in making the decision whether to seek the death penalty.

 Finally, Appellant argues that the one thousand year prison sentence for the Robbery is excessive. It is well settled that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances of each case. *Rogers v. State*, 507 P.2d 589, 591 (Okl.Cr.1973). This Court does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances that the sentence is so excessive as to shock the conscience of the Court. *Huntley v. State*, 750 P.2d 1134, 1136 (Okl.Cr.1988).

Appellant's prior felony convictions and the violent manner in which the robbery was committed support the sentence. Accordingly, this assignment of error is denied.

## V. MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1987, § 701.-13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1981, § 701.12. As noted above, the aggravating circumstance of prior felony conviction involving the use or threat of violence has not been supported by the evidence and therefore falls. In *Stouffer v. State*, 742 P.2d at 564 this Court held that an independent reweighing of aggravating circumstances and mitigating evidence is implicit to our statutory duty to determine the factual substantiation of the verdict and the validity of the death sentence. See also *Battenfield*, 816 P.2d at 564; *Sellers*, 809 P.2d at 691; *Castro*, 749 P.2d 1146. In *Clemons*, 494 U.S. at 749–751, 110 S.Ct. at 1449, the Supreme Court found nothing in appellate weighing or reweighing of the aggravating circumstances and mitigating evidence that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sen-

tence. The Court further stated that appellate courts are not hindered in performing this function without written jury findings concerning mitigating circumstances.

■ We have already found the evidence sufficient to support the jury's finding of the other aggravating circumstances found by the jury, i.e. that the murder was especially heinous, atrocious or cruel; that the murder was committed to avoid lawful arrest or prosecution, and that the Appellant constitutes a continuing threat to society. Evidence in mitigation presented in this case consisted of testimony from Appellant's family members concerning Appellant's childhood, including the trauma experienced when he was fourteen by the divorce of his parents; the love and support of family and friends; his record of being a good worker; his status as a trustee in the county jail and role as problem solver; his completion of bible study courses and involvement in the jail ministry; and his prospects for rehabilitation.

Discarding the evidence supporting the "prior violent felony conviction" aggravating circumstance, and carefully weighing the remaining aggravating circumstances against the mitigating evidence presented at trial, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting reversal or modification, the judgments and sentences for Robbery with a Dangerous Weapon, After Former Conviction of a Felony and First Degree Murder are AFFIRMED.

LANE, P.J., and JOHNSON, J., concur.

BRETT, J., not participating.